[No. S004359. Crim. No. 21942. June 22, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
LAWRENCE SIGMOND BITTAKER, Defendant and Appellant.

1048

**COUNSEL**

Richard Such, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John R. Gorey, Norman H. Sokolow, Susanne C. Wylie and Andrew D. Amerson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

BROUSSARD, J.—From June through October of 1979, defendant and Roy Norris kidnapped and murdered five teenage girls in the Los Angeles

area. Most of the killings involved the rape and torture of the victims. Defendant now stands convicted of 26 felony counts, as follows:

| Date of Crime | Victim | Crimes |
| --- | --- | --- |
| June 24, 1979 | Lucinda Schaefer | first degree murder<br>kidnapping<br>3 counts of rape |
| July 8, 1979 | Andrea Hall | first degree murder<br>kidnapping<br>2 counts of rape<br>forcible oral copulation |
| Sept. 2, 1979 | Jacqueline Gilliam | first degree murder<br>kidnapping<br>3 counts of rape |
| Sept. 2, 1979 | Leah Lamp | first degree murder<br>kidnapping |
| Oct. 31, 1979 | Shirley Ledford | first degree murder<br>kidnapping<br>rape<br>forcible oral copulation<br>forcible sodomy |
| Various | | 3 counts of possession of firearm by ex-felon |
| June-Oct. 1979 | | conspiracy to commit kidnapping and murder |

The jury found 38 special circumstances: 20 multiple-murder special circumstances (the arithmetic combinations of 5 murders), 5 felony-murder special circumstances based on kidnapping and 5 based on rape. It found felony-murder special circumstances based on forcible oral copulation as to victims Hall and Ledford, and forcible sodomy as to Ledford. The jury found intentional murder by means of torture as to all victims except Lamp; with respect to Lamp, it found as a special circumstance that she was killed to prevent her from testifying as a witness.

Defendant was sentenced to death. His appeal is automatic. We affirm the conviction and sentence.

I.

## SUMMARY OF FACTS

Defendant met Roy Norris while they were inmates in state prison. Defendant had been convicted of assault with a deadly weapon, arising from an incident in 1974 in which he stabbed a store clerk who accused him of shoplifting. Norris had been convicted of rape. The two men became friends, and frequently discussed their mutual interest in rape, and analyzed methods of abducting and raping women without getting caught.

Defendant was paroled in November of 1978 and rented a room at the Scott Motel in Burbank; Norris was paroled in January of 1979. After raping a woman in Colorado, Norris returned to California and called defendant. They would get together on weekends, and go to the beach where defendant would photograph teenage girls. They continued their discussion of rape, and explored various fire roads in the Southern California mountains, looking for places with adequate privacy. Defendant bought a van, choosing one with sliding doors to make it easier to seize a victim and drag her into the van.

In June of 1979 Norris attempted to rape a woman, but she escaped. He told defendant, and they agreed that thereafter they would act together in all their criminal activities.

1. *The testimony of Roy Norris.*

Norris testified for the prosecution pursuant to a plea bargain under which he pled guilty to five murders and received a sentence of forty-five years to life.

(a) *The murder of Lucinda Schaefer.*

On June 24, 1979, defendant was driving the van, with Norris as passenger, on the Pacific Coast Highway in Redondo Beach. They saw Lucinda (Cindy) Schaefer, age 16, walking along the highway. She turned onto a residential street. Defendant drove by and offered her a ride, but she refused. Defendant then parked the van a short distance down the street. Norris got out and pretended to be repairing it. When Schaefer walked by, he grabbed her and dragged her into the van. While defendant drove away, Norris bound and gagged the victim.

When they arrived at the fire road in the mountains, Norris raped Schaefer while defendant stood lookout. Defendant raped her, then Norris a second time. She asked Norris if the men intended to kill her, and asked for

time to pray before they did; Norris, however, assured her that she would not be killed. Defendant then returned to the van, and Norris stood watch outside. After about 45 minutes defendant emerged, and the 2 men argued whether to kill Schaefer. Norris said he had told Schaefer that she would not be killed, but defendant insisted on killing her so she could not identify them. Defendant said that kidnapping with bodily harm carried a sentence of life imprisonment without possibility of parole. Norris was unwilling to risk such a sentence, and finally agreed to the killing.

Defendant held Schaefer while Norris tried to strangle her, but when he changed his grip Schaefer and defendant fell over backwards. Defendant dropped his cigarette, which burnt a hole in his shirt and scarred his chest.[1] Defendant then attempted to strangle Schaefer, but was unable to squeeze tightly enough. He took a clothes hanger, and looped it around her neck. Norris could not get the hanger tight enough, but defendant used pliers to tighten it and kill Schaefer. They then threw the body into the bushes.

### (b) The murder of Andrea Hall.

On July 4, 1979, defendant and Norris set out to find another victim. While driving in Manhattan Beach they saw Andrea Hall, age 18, who was hitchhiking to visit her boyfriend in Wilmington. Before they could offer her a ride, a man in another car picked up Hall. Defendant and Norris followed that car to Redondo Beach, where Hall got out and resumed hitchhiking. Defendant offered her a ride. After she entered the van Norris, who had been hiding in the back, attacked her and after a fight managed to bind and gag her.

They drove into the mountains, passing the place where Schaefer was killed. Norris got out and stood guard while defendant raped Hall. The men then traded activities. When it was Norris's turn to wait outside again, he thought he saw headlights coming up the fire road. Defendant took Hall into some bushes by the road while Norris drove the van, searching unsuccessfully for the intruder. When Norris returned, they drove to a new location. Defendant took Hall up a small hill, maintaining communication with Norris by walkie-talkie. Upon returning two hours later defendant showed Norris eight photographs he had taken. One of these photographs, which shows Hall about to perform oral copulation on defendant, is in evidence. Norris described the other photographs, which showed Hall nude in various poses.[2]

---

[1] Defendant, when arrested, had a scar on his chest as described by Norris.

[2] Defendant had mailed the photograph in evidence to Richard Shoopman, an inmate friend. Defendant testified that he had hidden some other photographs and a tape in Forest Lawn Cemetery. Although found in contempt of court, he refused to divulge their exact loca-

Defendant drove to another place, said he wanted to rape Hall again, and again took her to a hill near the road. Norris drove to a store, keeping in communication by radio. When he returned, defendant was alone. He told Norris he had taken more pictures. He showed Norris two pictures in which Hall appeared frightened, and told Norris that he took them after telling Hall that he was going to kill her, and challenging her to come up with as many reasons as she could why he should not kill her. Defendant then killed Hall by thrusting an ice pick through her ear into her brain.[3] When she did not die instantly, he turned her over and pushed the pick through the other ear, and stepped on it until the handle broke. He then strangled Hall until she died and threw the body over an embankment into some bushes.

### (c) *The murders of Jacqueline Gilliam and Leah Lamp.*

On September 2, 1979, Jacqueline Gilliam, age 15, and Leah Lamp, 13, were hitchhiking in Redondo Beach. Defendant and Norris picked them up in defendant's van. After the girls entered the van, Norris hit Lamp with a sap (a plastic bag filled with lead weights), then subdued and tied Gilliam. Lamp recovered consciousness and attempted to escape, but defendant caught her and forced her back into the van. Defendant then drove into the mountains, driving beyond the site of the other two murders.

Neither defendant nor Norris was sexually interested in Lamp. Defendant set out to rape Gilliam. Learning that she was a virgin, he set up a tape recorder to record her cries during the rape. After Norris also raped Gilliam, they retied the girls, and all remained in the van over night.

The next morning defendant took Lamp up a hill, took some photographs, and left her there. Upon returning, he arranged for Norris to take a series of photographs of him with Gilliam, beginning with them clothed, then nude, then during intercourse and oral copulation. Defendant brought Lamp back to the van, and they drove into town for food and supplies.

Upon their return, defendant took additional nude photographs of Gilliam. Some of these photographs came into possession of defense counsel, who turned them over to the police, and they were admitted into evidence.

---

tion, and a police search failed to find them. Relying on the descriptions by Norris and other witnesses, a police artist reconstructed some of the photographs. The judge, however, refused to admit the drawings into evidence, ruling that they would be more prejudicial than probative.

[3] Defendant and Norris had seen a gangster movie while in prison in which the villain killed his victims in this fashion. According to Norris, it impressed defendant as an instantaneous, quiet, and relatively painless way of killing, but as defendant said, in reality it was not that easy.

(At this point, according to Douglas, defendant tortured Gilliam. Norris does not mention torture.) Norris suggested that they kill Gilliam quickly because she had been so helpful, but defendant replied that "they only die once, anyway." Defendant then took Gilliam out of the van and killed her, first thrusting an ice pick through her ear into her brain, then choking her. Defendant returned to the van, aroused Lamp (who had been forced to take tranquilizers to keep her quiet), and as she stepped out of the van, struck her with a sledgehammer. Defendant choked Lamp while Norris struck her with the hammer until she was dead. The men threw both bodies over an embankment into the chaparral.

### (d) The attempted abduction of Jan Malin.

On September 27, 1979, defendant and Norris attempted to abduct an unidentified woman, but she dodged behind the van and escaped. On September 30, they saw Jan Malin park her car in an apartment garage, and return to the garage entrance to close the garage door. Defendant approached, sprayed her with Mace, and attempted to drag her into the van. Malin screamed, and people started to come out of the houses nearby. Norris then drove away without defendant, who fled on foot. Malin's testimony corresponded to Norris's account.

### (e) The murder of Shirley Ledford.

Late in the evening on October 31, 1979, defendant and Norris picked up Shirley Ledford, age 18, who was hitchhiking home from her job. Defendant drove to a secluded area, stopped, and drew a knife. Norris then moved into the driver's seat. Defendant turned on his tape recorder. As Norris drove, he could hear screams coming from the back of the van. After one to two hours, defendant turned off the recorder and changed places with Norris. Norris compelled Ledford to orally copulate him, then turned on the recorder and began hitting her on the elbow with a hammer.

When Norris finished torturing Ledford, defendant told him to kill her. Norris strangled the victim with a coat hanger. Defendant suggested dumping the body in someone's front yard so they could see the reaction in the newspaper. They put Ledford's body in a bed of ivy in a suburban neighborhood, where it was discovered by an early morning jogger.

### 2. Other prosecution evidence.

### (a) The bodies.

The bodies of Lucinda Schaefer and Andrea Hall were never found. Friends and family testified that they had never been seen after the date

when Norris said they were killed. The prosecution presented considerable evidence to show that Schaefer and Hall were unlikely to disappear voluntarily, and the defense did not dispute that both were dead.

With Norris's assistance, the police discovered and identified the skulls of Jacqueline Gilliam and Leah Lamp. A portion of an ice pick was lodged in Gilliam's skull. Lamp's skull showed the effect of the hammer blows.

Shirley Ledford's body was discovered shortly after she was killed. The coat hanger was still wrapped around her neck. The body had extensive bruising and tearing on the breasts, bruises on the genitals, and bruises on one elbow. Laboratory examination showed sperm in her mouth, vagina and anus.

(b) *Tapes, photographs, and other physical evidence.*

As we have noted, one of defendant's photographs of Andrea Hall and six of Jacqueline Gilliam were identified and introduced into evidence. The tape recording of the torture of Shirley Ledford was discovered in defendant's van. The first portion of the tape contains a male voice, identified as defendant's, and screaming from a female voice, stipulated to be Ledford's. At one point defendant demands Ledford tell him what she is doing, and she describes an act of oral copulation. The second portion of the tape contains Norris's voice, urging Ledford to scream, and more screaming by Ledford.

Ledford's bracelet was discovered in Norris's apartment. Defendant's van contained a small sledgehammer. In his room police discovered seven bottles of various acids, which Norris said defendant planned to test on his next victim.

(c) *Testimony of other motel residents.*

Richard Dryburgh, another resident of the Scott Motel, testified in return for dismissal of a charge of possession of an explosive. He said defendant showed him nude photographs of the victims, told him one was named "Cindy," and that she had been killed. Shown a picture of Lucinda Schaefer, Dryburgh said she was one of the girls in the photographs he had seen.[4] Dryburgh further testified that defendant told him of kidnapping and killing two girls on one occasion, but incorrectly identified Schaefer as one of the two. He correctly identified a photograph of Gilliam. Mike Horn, an-

---

[4] Norris, however, said he took no photographs of Schaefer, and as far as he knew defendant also took no photographs of her.

other resident, testified that defendant showed him photographs of Gilliam and Hall.

Christina Dralle, a 17-year-old girl staying at the motel, said defendant showed her photographs of Gilliam and four other girls, and said, "The girls I get won't talk any more." On another occasion she heard a tape, apparently the recording of the rape of Gilliam, which defendant played for her. Steven Eastman, a visitor at the motel, also heard the tape.

(d) *Testimony of inmates.*

David Lambert shared a jail cell with defendant. At defendant's request, Lambert drew a picture of a girl on the cell wall. Defendant said it looked like "Cindy," and asked Lambert to add coat hangers and pliers to the picture. Defendant then signed it "Pliers Bittaker," a jail nickname he had acquired from his stories of torturing women with pliers. Defendant signed autographs for other prisoners using that nickname. One said, "hitch-hikers welcome, females especially"; another said, "Norris did it." Defendant also told Lambert of his abduction of two girls on one occasion, and of another girl on Halloween night (when Ledford was murdered).

Lloyd Carlos Douglas testified that defendant told him in detail of the abduction of Gilliam and Lamp, the rape and torture of Gilliam, and the murder of both girls. (Norris did not describe any torture of Gilliam.) According to Douglas, defendant said he pinched Gilliam's legs and breasts with a vise grip, finally tearing off part of the nipple, then thrust an ice pick through her breast and twisted it. He then pushed the ice pick through Gilliam's ear; she screamed and fell dead. Defendant told Douglas that he tortured Ledford by pulling on her genitals and breasts with a vise grip.

3. *Defendant's case.*

The defense contended that Norris, not defendant, was responsible for the murders. Richard Shoopman, a convict friend of defendant and Norris, said Norris had told him many times of his desire to rape young women. Norris said the look of shock and fear on the victim's face particularly aroused him. Defendant, on the other hand, seldom talked to Shoopman about sex.

Defendant testified on his own behalf, and said that he was not involved in the abduction and murder of Lucinda Schaefer, but that Norris told him that Norris and another man had committed those crimes. He testified that he and Norris picked up Andrea Hall when she was hitchhiking, and offered her $200 for sex and photographs, to which she agreed. They drove

into the mountains, engaged in various sexual acts, and took pictures. Defendant then returned to the van. A while later Norris returned alone, and told defendant that Hall could find her own way home.

Defendant testified that after he and Norris picked up Gilliam and Lamp, he offered Gilliam money if she would pose for photographs. She agreed. They drove to the mountains where he and Norris took the photographs and made a tape recording. The next day Norris dropped defendant at Norris's residence and left to drive the girls home in the van. Defendant testified that he never saw them again.

Defendant admitted the assault on Jan Malin, and his description of the incident corresponds to that of Norris and Malin. He claimed, however, that his purpose was not to kidnap Malin, but to test the effectiveness of Mace as a defensive weapon.

Finally, defendant testified that Shirley Ledford agreed to sexual acts for money, and to making of a tape. She screamed on cue for the tape, but was not tortured in his presence. Defendant said that after making the tape he returned to his motel, leaving Ledford with Norris.

On cross-examination, defendant acknowledged that he had begun writing a book, and had shown drafts to a newspaper reporter and a guard. The book, entitled "The Last Ride," contained a detailed account of the murder of Lucinda Schaefer by Norris and the author. It also described the abduction and rape of Andrea Hall (but not her murder), and the abduction of Gilliam and Lamp.[5] In explanation, defendant said that the book was part fact, based on what he had been told by Norris, and part fiction.

### 4. *Penalty phase evidence.*

Gary Louie, the victim of defendant's 1974 assault, testified at the penalty trial. He saw defendant leave a grocery store with a package of meat hidden in his clothes. Louie followed defendant outside and asked if defendant had forgotten to pay for anything. Instantly, without saying a word, defendant stabbed Louie. Defendant was caught by two other employees. The defense presented psychiatric evidence that defendant may have been in an altered state of consciousness at the time of the assault; the prosecution presented contrary expert evidence in rebuttal.

Psychologist Michael Maloney testified for the defense. He described defendant's lengthy criminal career dating from adolescence, but noted that

---

[5] The book itself was not put into evidence. Certain portions were read by the prosecutor, and acknowledged by defendant, on cross-examination.

except for the 1974 incident the crimes were nonviolent, primarily shoplifting and auto theft. On one occasion defendant committed a crime and was returned to custody the day of his release. Dr. Maloney said defendant was quite intelligent (I.Q. over 130). He has no mental illness except an inability to empathize with others. He classified defendant as an "antisocial personality," a diagnostic category that replaces the former designations of psychopath and sociopath.

## II.

### SEARCH AND SEIZURE ISSUES

Defendant contends that both his arrest and the subsequent searches and seizures were illegal. Defendant's motion to suppress the seized evidence under Penal Code section 1538.5 was denied by the trial court.

### 1. *Validity of arrest warrant.*

■ Defendant argues that the warrant for his arrest and, hence, his arrest, the searches and seizures incident thereto, and statements obtained from defendant while under arrest were improperly obtained because no complaint was on file at the time the arrest warrant was issued.

Defendant was arrested pursuant to a "Ramey" arrest warrant[6] based upon an affidavit filed by a Sergeant Bynum of the Hermosa Beach police department. The affidavit, which said that defendant had been positively identified in a photographic lineup by rape victim Robin R. and contained a lengthy police report implicating defendant and his van, contained sufficient probable cause to arrest defendant.[7] Thus, defendant does not allege insufficient probable cause; rather, he contends that the procedure and form used for the issuance of the warrant were illegal.

■ A "Ramey" arrest warrant is issued by a magistrate upon the filing of an affidavit form entitled "Probable Cause Complaint in Support of Felony Arrest Warrant." At the bottom of the form is the phrase "The complaint underlying this warrant of arrest does not initiate a criminal

---

[6]"Ramey" arrest warrant and affidavit forms resulted from our decision in *People* v. *Ramey* (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d 1333], which held that the constitutional prohibition against unreasonable searches and seizures applies to persons as well as to property.

[7]Ironically, despite defendant's many crimes he was actually arrested for one which he may not have committed. Robin R. was unable to identify defendant in person, her description of the interior of the van where she was held did not match defendant's van, and the manner of her kidnapping and rape differed from defendant's characteristic mode of operation. Consequently defendant was not charged with the Robin R. crimes.

proceeding." ▇▇▇ Defendant contends that an arrest warrant can issue only upon a complaint,[8] that a complaint is a document which institutes a criminal proceeding,[9] and thus that a document which says it does not institute criminal proceedings cannot be the basis for an arrest warrant.

Neither constitutional[10] nor statutory directives concerning warrants require that criminal proceedings must be instituted before an arrest warrant may be issued. As the Court of Appeal correctly found in *People* v. *Case* (1980) 105 Cal.App.3d 826, 834 [164 Cal.Rptr. 662]: "Reported decisions in cases interpreting Penal Code section 872 [order holding defendant to answer] have uniformly held that the 'complaint' filed with the magistrate under Penal Code sections 813 and 806 serves *only* the purpose of providing a basis for the issuance of a warrant of arrest. Once an individual is arrested and is before the magistrate, the 'complaint' is *functus officio* . . . ." (Fn. omitted.)

It is apparent that the "complaint," as the term is used in the Penal Code, serves two different purposes. One is to initiate criminal proceedings; the other to demonstrate probable cause for an arrest warrant. A complaint can be used to institute criminal proceedings without serving as a basis for an arrest warrant, and we see no reason why the converse may not also serve— that a complaint can furnish probable cause for arrest even though a different document is used to institute proceedings. The important point, and one defendant concedes, is that probable cause was shown to support the issuance of the arrest warrant; it is immaterial whether that same document initiated criminal proceedings against him.

2. *Arresting officers' compliance with section 844.*

▇▇▇ ▇▇▇▇ ▇▇▇ ▇▇ Defendant argues that during his arrest the police failed to comply with sections 844 and 1531 because they failed to identify themselves as police officers or to explain the purpose of their demand for

---

[8] Penal Code section 813 provides in pertinent part: "When a complaint is filed with a magistrate charging a public offense originally triable in the superior court . . . if the magistrate is satisfied from the complaint that the offense . . . has been committed and that there is reasonable ground to believe that the defendant has committed it, the magistrate shall issue a warrant for the arrest of the defendant . . . ."

All statutory references are to the Penal Code unless otherwise stated.

[9] Section 806 provides in relevant part: "A proceeding for the examination before a magistrate of a person on a charge of an offense originally triable in a superior court must be commenced by written complaint under oath subscribed by the complainant and filed with the magistrate."

[10] The Fourth Amendment to the United States Constitution and the identically worded article I, section 13 of the California Constitution, both simply provide that: ". . . a warrant may not issue except on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons and things to be seized."

admittance.[11] After Norris was arrested by the Hermosa Beach police, Sergeant Bynum directed the police dispatcher to request the Burbank police to arrest defendant on the warrant which Sergeant Bynum held. Six or seven uniformed police officers participated in defendant's arrest. After the officers were stationed at all of defendant's windows, Officer Valento knocked on the door of defendant's motel room. Although the evidence on this point is conflicting, Officer Valento may have announced that it was the Burbank police.[12] After receiving no response from within the motel room, Officer Valento knocked two more times. After the third knock, the bathroom window to the immediate right of the door was opened by the defendant, who asked, "Who is it?" Officer Valento, who recognized defendant, stated that defendant was under arrest, and grabbed his arm through the open window.[13] After defendant responded in the negative to Officer Valento's inquiry whether anyone else was present in defendant's room, the officer directed another officer to kick in the locked door so that the officers could enter the room and take defendant completely into their custody.

 The notice requirements of section 844 provide that before breaking into a home to effect an arrest, a police officer must identify himself, announce his purpose and demand entry. (*People* v. *Hill* (1974) 12 Cal.3d 731, 758 [117 Cal.Rptr. 393, 528 P.2d 1].) It is undisputed that Officer Valento technically complied with the knock requirement. Whether the identification/notice of authority requirement was fulfilled is less clear. We may presume, however, that the trial court resolved the conflicting testimony in favor of the testimony of Sergeant Farrand that an announcement was made.

---

[11] Section 844 provides in relevant part: "To make an arrest . . . a peace officer . . . may break open the door or window of the house in which the person to be arrested is . . . , after having demanded admittance and explained the purpose for which admittance is desired." Section 1531 provides in pertinent part: "The officer may break open any outer or inner door or window of a house . . . or anything therein, to execute the [search] warrant, if, after notice of his authority and purpose, he is refused admittance."

This court has held that sections 844 and 1531 are "identical in principle," so although section 844 does not expressly require notice of the arresting officer's authority, this type of notice is "an integral part of the rule stated in section 844." (*Greven* v. *Superior Court* (1969) 71 Cal.2d 287, 292, fn. 6 [78 Cal.Rptr. 504, 455 P.2d 432].)

[12] Sergeant Farrand, an officer participating in defendant's arrest, testified that Officer Valento announced that it was the Burbank police after knocking on the door. Sergeant Farrand was stationed approximately five to six feet away from Officer Valento during the arrest. Conversely, Officer Valento testified that he "didn't announce [his] presence at all when [he was] knocking."

[13] Although the testimony is unclear whether Officer Valento informed defendant of the warrant for his arrest prior to or subsequent to grabbing his arms, defendant assumed on appeal that he was informed of the purpose of the police action prior to the grabbing of his arms.

All that is lacking by way of full compliance with section 844 is an announcement of the officer's purpose. But when defendant appeared at the window, an announcement of purpose before arresting him would have been hazardous. Defendant was known to carry weapons.[14] Any delay would have allowed him to duck back inside the room and resist entry. Thus the police seizure of defendant, whether preceded or followed by an announcement of purpose, was justified by the circumstances. (See *Parsely* v. *Superior Court* (1973) 9 Cal.3d 934, 938 [109 Cal.Rptr. 563, 513 P.2d 611].)

Defendant unpersuasively argues that the second entry by the officers, when the door was kicked in, violated section 844 because the officers failed to give defendant an opportunity to admit them. But the officers, having seized defendant at the window, could not release him without giving him a chance to grab a weapon and resist entry.

3. *Legality of search of motel room.*

Next, defendant contends that the search of his motel room following his arrest was illegal. Defendant claims his purported consent to the search was vitiated by the allegedly illegal arrest (a contention we have already rejected), that the trial court failed to rule on the voluntariness of his consent, that if defendant did in fact consent to the search, he did not consent to the seizure of evidence, and that the items seized by the police officers failed to meet the "nexus" requirement of *Warden* v. *Hayden* (1967) 387 U.S. 294 [18 L.Ed.2d 782, 87 S.Ct. 1642], and *People* v. *Hill, supra,* 12 Cal.3d 731, 763 (overruled on other grounds in *People* v. *DeVaughn* (1977) 18 Cal.3d 889, 896 [135 Cal.Rptr. 786, 558 P.2d 872]).

Following defendant's arrest, Officer Valento informed defendant that he was under arrest for robbery, rape, and "288." (Section 288 is lewd or lascivious acts involving children. The arrest warrant in fact specified forcible oral copulation, which is section 288a.) After the arresting officers had notified the Hermosa Beach police department that they had defendant in custody, the officers were informed that defendant may have been involved in "some 187's [murders] of females, that there was Mace or some other type of chemical agent used in one of the attacks," and that some of the victims may have been photographed. Officer Valento explained this to

---

[14] The officers reasonably assumed that defendant had access to a weapon, because the offenses charged in the warrant involved the use of a weapon, previously Officer Valento contacted defendant concerning a report that he had exhibited a firearm during a strike at his place of employment and found that defendant had a replica gun but had live ammunition as well, and the officers had received information that defendant might have some sort of chemical, Mace, or tear gas.

defendant, and asked if defendant had any objections to the police searching his room for evidence concerning those crimes. Defendant indicated that he had no objection to a search. In fact defendant helped throughout the search, pointing out photographs in a box, and opening his combination safe for the officers. The officers ultimately seized numerous photographs, several police scanners, a replica .45 caliber gun, several bottles and jars of chemicals, pornographic film, and various other items.

■ Defendant's contention that the trial court failed to rule on the voluntariness of his consent, and thus failed to adjudicate a fundamental issue, is meritless. Defendant's case is distinguishable from the cases upon which he relies (*People* v. *Rios* (1976) 16 Cal.3d 351 [128 Cal.Rptr. 5, 546 P.2d 293]; *People* v. *Kanos* (1969) 70 Cal.2d 381 [74 Cal.Rptr. 902, 450 P.2d 278]; *People* v. *Henry* (1967) 65 Cal.2d 842 [56 Cal.Rptr. 485, 423 P.2d 557]; *People* v. *Sesslin* (1968) 68 Cal.2d 418 [67 Cal.Rptr. 409, 439 P.2d 321]; *People* v. *Blair* (1975) 51 Cal.App.3d 480 [124 Cal.Rptr. 123]) because here the sole ground asserted by the People to justify the warrantless search of defendant's motel room was consent. Therefore, when the trial court denied defendant's suppression motion, it necessarily ruled on the voluntariness of defendant's consent.

■ Finally, defendant argues that even if his consent to the search was voluntary, he did not consent to the seizure of evidence. This argument, however, depends upon defendant's further claim that there was no "nexus" between the items seized and criminal activities, for given a suitable "nexus," the police may seize any item discovered during a consensual search.

In *People* v. *Hill, supra,* 12 Cal.3d 731, we noted that in *Warden* v. *Hayden, supra,* 387 U.S. 294, the United States Supreme Court held that police may not indiscriminately seize items discovered during the course of a lawful police search. Rather, " '[T]here must . . . be a nexus—automatically provided in the case of fruits, instrumentalities or contraband—between the item to be seized and criminal behavior. Thus, in the case of "mere evidence," probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction. [Citation omitted.]' " (*Hill, supra,* 12 Cal.3d at p. 762.)

In light of the content of defendant's arrest warrant (robbery, rape, and forcible oral copulation) and the communications received over the telephone from the Hermosa Beach police department (possible photographs taken of victims, and possible involvement in murders), there appears to be sufficient nexus for the police to seize at least the photographs, camera,

pistol, and chemicals. Most of the other items seized were not offered into evidence, and their seizure did not prejudice defendant.

4. *Legality of seizure of van.*

■ Defendant contends that the warrantless seizure of his van following his arrest was illegal because the officers did not come upon the van "inadvertently" (*Coolidge* v. *New Hampshire* (1971) 403 U.S. 443 [29 L.Ed.2d 564, 91 S.Ct. 2022]), and lacked probable cause for its seizure. However, the trial court properly relied on *People* v. *Teale* (1969) 70 Cal.2d 497 [75 Cal.Rptr. 172, 450 P.2d 564] and its progeny to uphold the seizure of the van as an instrumentality of the crime.

The officers lawfully seized defendant's van when "incidental to a lawful arrest, [they seized it] in the reasonable belief that such object *is itself evidence* [fn. omitted] of the commission of the crime for which such arrest is made. . . ." (*People* v. *Teale, supra,* 70 Cal.2d 497, 511, italics in original.) In *Teale,* Federal Bureau of Investigation officers arrested defendant in his car and thereupon seized, locked and stored the car until California authorities were able to examine it 10 days later. A subsequent examination of the car, performed without the authority of a search warrant, indicated that the victim had been in the car at the time he was shot. In upholding the car's seizure, this court drew a distinction between seizure of a car which is itself evidence of a crime, and a car which is a mere container of incriminating articles.

*North* v. *Superior Court* (1972) 8 Cal.3d 301 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155], relied on *Teale, supra,* 70 Cal.2d 497, to uphold a seizure of the defendant's car, parked outside his apartment, although the defendant had been arrested inside his apartment. We held that *Teale* did not intend to limit the seizure of evidence in plain view only to those objects within the immediate reach of the person arrested. (*North,* at p. 306.) Rather, seizure of any object in plain view which is itself evidence of a crime is legal (*ibid.*) provided the arresting officer views it from a position in which he has a legal right to be.

The majority in *North, supra,* 8 Cal.3d 301, rejected the defendant's contention that the police must come across the evidence inadvertently, the requirement urged by a minority of the United States Supreme Court in *Coolidge* v. *New Hampshire, supra,* 403 U.S. 443. Although the plurality opinion of Justice Stewart concluded that a seizure could not be justified on the theory that the vehicle was itself the "instrumentality" of the crime because the plain-view doctrine applied only to *inadvertent* discovery of incriminating evidence (*id.,* at pp. 464-473), only four members of the court

signed that portion of the opinion. *North* therefore declined to view *Coolidge* as controlling.

The facts in *North, supra,* 8 Cal.3d 301, parallel those of the present case. In *North* a young girl was abducted at knifepoint by the defendant and forced into his car. The victim identified defendant and described the car. Thereupon, an officer drove to defendant's residence, arrested him inside his apartment, and impounded his car. The car was later searched at the police station and incriminating evidence was discovered.

In the case at bar, the police were furnished a description of defendant's van by Robin R., who was allegedly kidnapped and raped by defendant and Norris in the van. Ms. R. also selected defendant's photograph out of a photographic lineup of potential suspects. Although Ms. R. did not describe the van with the same specificity as North's victim's description of the car, the critical similarity is that in both cases the police had probable cause to believe the vehicle was not merely a container of evidence, but an instrumentality of the crime. Thus, the trial court correctly upheld the van's seizure based upon *People* v. *Teale, supra,* 70 Cal.2d 497, and *North* v. *Superior Court, supra,* 8 Cal.3d 301.

Defendant, however, contests probable cause because of Ms. R.'s "inaccurate" description of the van's color. (She described the van in which she was abducted as light blue, when defendant's van in fact is silver.) Despite this inconsistency, the fact that Ms. R. positively identified defendant in a photographic lineup, in addition to the fact that her description of the van closely approximated its actual appearance, create sufficient probable cause for the arresting officers to seize the van as an instrumentality of a crime.

5. *Lawfulness of search of impounded van.*

Three days after the police seized defendant's van, Sergeant Bynum and another officer entered it to search for bloodstains, semen stains, and other evidence of Ms. R.'s rape. Upon entering the van, they realized that its interior did not match Ms. R.'s description. They saw, however, a number of items in plain view which, they realized, might be evidence of other crimes they were investigating. They eventually seized a number of items, including two pieces of jewelry (crosses with chains), a douche package, a "sap," a book on locating police broadcasting frequencies, a container of Vaseline, and several cassette tapes, including the tape recording the torture of Ledford. All of these items were admitted into evidence except for the tapes other than the Ledford tape.

Defendant argues that the postimpoundment search of the van and seizure of the items inside exceeded the scope of a permissible examination

to determine the van's "evidentiary value" as is permitted by the *Teale* (*supra*, 70 Cal.2d 497) line of cases. He claims that when the officers began seizing items contained in the van, rather than merely "examining" the van for its "evidentiary value," the officers went beyond the permitted examination. Their actions turned into a "search," and thus a warrant was necessary.

*Teale, supra,* 70 Cal.2d 497, did not address the propriety of the seizure of independent items of evidence during the examination of the instrumentality. However, in *North v. Superior Court, supra,* 8 Cal.3d 301, the court refers to tests conducted on defendant's car (e.g., tire impression, wheel span, etc.), and it also stated that "examination of the vehicle turned up *additional evidence* linking [defendant] with the crime." (*Id.*, at p. 305, italics added.) It is unclear exactly what the "additional evidence" was, but the implication is that it was evidence other than that resulting from the various scientific tests conducted on the car itself. Further, in *People v. Rogers* (1978) 21 Cal.3d 542 [146 Cal.Rptr. 732, 579 P.2d 1048], we relied on *Teale, supra,* 70 Cal.2d 497, to uphold the seizure of magazines and paraphernalia and a loaded revolver from a van belonging to the defendant, who was accused of molesting children and photographing them in his van. (*Rogers,* at p. 546.) Both *North* and *Rogers* appear to suggest that the permissible examination following a warrantless seizure of an instrumentality of a crime includes the search and seizure of independent items of evidence contained within the instrumentality itself.

In *People v. Minjares* (1979) 24 Cal.3d 410 [153 Cal.Rptr. 224, 591 P.2d 514], however, the court criticized the use of the "instrumentality of the crime" theory to justify the search of an automobile.[15] Holding that the doctrine did not permit the search of a closed container within a vehicle (p. 423)—a holding that does not affect the present case—the court remarked that "[i]f there were any vitality to the 'instrumentality' exception as it applies to automobiles . . ., it would be applicable only to a scientific examination of the object itself, for example for fingerprints, bloodstains, or the taking of tire impressions or paint scrapings." (P. 422.)

Thus while the instrumentality doctrine justifies the officer's entry into the van to search for bloodstains and other evidence of Ms. R.'s rape, it may not in itself justify the search of the van for other objects not attached to or part of the van itself. But that argument does not help defendant, for once the officers were lawfully in the van, they were entitled to seize, without a

---

[15] The present case antedates the enactment of article I, section 28, of the California Constitution, which bars exclusion of relevant evidence in criminal proceedings. Thus the trial court had authority to exclude evidence seized in violation of the California Constitution as interpreted in *Minjares.*

warrant, those objects then in plain view which evidenced defendant's criminal acts. (See *Warden* v. *Hayden, supra,* 387 U.S. 294.) Thus, the search of the van and the seizure of items therein were properly held to be lawful by the trial court.

### 6. The "search" (listening) of the Ledford tape.

 Defendant argues that assuming the seizure of the cassette tapes from his van was lawful, it was unlawful for the police to "search" (i.e., listen to) the Ledford tape without a warrant. (See *Walter* v. *United States* (1980) 447 U.S. 649 [65 L.Ed.2d 410, 100 S.Ct. 2395] [warrant required to view films lawfully in possession of Federal Bureau of Investigation].) Defendant, however, is barred from raising this objection on appeal because he failed to object to the playing of the tape in the trial court.[16] (*People* v. *Rogers, supra,* 21 Cal.3d 542, 547-548.) Because defendant failed to object, the prosecution did not attempt to justify the search, with the result that the record on appeal is insufficient to resolve the issue of its validity. For the same reason, we cannot determine whether it is reasonably probable that a result more favorable to defendant would have resulted from a timely objection. (See *People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144].)

### 7. Searches pursuant to a warrant of defendant's van, storage boxes, and jail cell.

Defendant contends that subsequent searches of his van, storage boxes, and jail cell, done pursuant to a warrant, were unlawful. In the trial court defendant objected to the admission of evidence seized in these searches on the ground that the warrant was based on an affidavit containing reference to the contents of the Ledford tape, which was allegedly illegally seized. Since we have determined that the tape was properly seized, and defendant failed to object to the playing of the tape, the issue does not warrant further discussion.

On appeal, defendant alleges that he was denied effective assistance of counsel evidenced by his counsel's failure to object to the searches at issue on the following additional grounds: (1) the seizure of items not specified in the warrant exceeded the scope of the warrant; (2) some of the items authorized for seizure by the warrant were not supported by probable cause; and (3) the warrant for seizure of "sexual literature" was impermissibly overbroad. As was the case with the listening to the Ledford tape, the

---

[16] At trial, defendant objected to the *seizure* of the tape from the van, but not to the subsequent "search" of the tape.

record on appeal is insufficient for us to conclude these asserted grounds constitute ineffective assistance of counsel.

8. *The search of Shoopman's jail cell.*

After finding several letters from Richard Shoopman to Norris and defendant during the search of Norris's residence, the police became interested in the extent of Shoopman's knowledge of and possession of evidence of the alleged crimes. Therefore, on December 27, Judge Woolpert of the San Luis Obispo Superior Court executed a warrant authorizing the search of Shoopman's cell in the California Men's Colony for letters or photographs sent to Shoopman from defendant or Norris. The police ultimately recovered fourteen photographs and five letters, two of which were introduced as evidence.

Defendant contends that the search of Shoopman's cell and seizure of evidence was illegal because the affidavit supporting the warrant contained a reference to the contents of the Ledford tape.[17] We have held, however, that the Ledford tape was properly seized, and that defendant's failure to object bars him from attacking the police's listening to the tape. Even if we were to assume that the search and seizure of the Ledford tape was unlawful, the affidavit supporting the warrant authorizing the search of Shoopman's cell contains more than sufficient probable cause. Among other information, the affidavit contains the contents of letters seized from Norris's residence in which Shoopman acknowledged receiving photographs of young girls from Norris and defendant. Further, the affidavit recounts a conversation between defendant and one of his fellow inmates, in which defendant admitted that he had sent Shoopman three photographs which show where defendant and Norris had dumped the bodies of the girls.

## III.

### DEFENDANT'S RIGHT TO BE PRESENT

Defendant claims he was improperly deprived of his constitutional and statutory right to be present on seven occasions during trial. He argues he was prejudiced by his absence (1) from a continuance hearing on the Friday prior to trial; (2) from an in-chambers conference where the trial court advised the district attorney and defense counsel that it would limit

---

[17] Since this case arose prior to the enactment of article I, section 28, of the California Constitution, defendant relies on the vicarious exclusionary rule established by earlier California decisions (*People* v. *Martin* (1955) 45 Cal.2d 755 [290 P.2d 855]; *Kaplin* v. *Superior Court* (1971) 6 Cal.3d 150 [98 Cal.Rptr. 649, 491 P.2d 1]).

the death-qualifying voir dire to four questions; (3) when the court advised a jury-selection expert, who arrived in the court's chambers without prior notice, that it would not authorize payment of county funds for her fees; (4) from a hearing following the prosecution's subpoena requiring defense counsel to produce photographs allegedly given him by defendant; (5) from an ex parte communication with the jury where the court advised the jurors on the "gruesome" nature of the evidence and reminded them of their obligation to evaluate it dispassionately; (6) and (7) from at least two in-chambers conferences on the scope of cross-examination.

"[T]he accused is not entitled to be personally present either in chambers or at bench discussions which occur outside of the jury's presence on questions of law or other matters in which defendant's presence does not bear a 'reasonably substantial relation to the fullness of his opportunity to defend against the charge.'" (*People v. Jackson* (1980) 28 Cal.3d 264, 309-310 [168 Cal.Rptr. 603, 618 P.2d 149]; *People v. Bloyd* (1987) 43 Cal.3d 333, 360 [233 Cal.Rptr. 368, 729 P.2d 802]; *People v. Teitelbaum* (1958) 163 Cal.App.2d 184 [329 P.2d 157].) With respect to six of the seven instances cited, we see no arguable basis for claiming that defendant's absence "prejudiced his case or denied him a fair and impartial trial." (*Jackson, supra,* at pp. 309-310; *Bloyd, supra,* at p. 360.)

■ The only doubtful matter is defendant's absence from a hearing on his counsel's motion for a continuance the Friday immediately prior to the trial. Defendant's attorney had just learned that Lloyd Douglas would be a witness against defendant, and asked for additional time in which to investigate Douglas. Defendant claims that if present he could have given the court or his attorney information that may have served as a basis for the court granting a continuance. This would have enabled his attorney to research Douglas's background, prepare for his testimony and assess whether they should have modified the defense strategy in light of Douglas's expected testimony.

However, defendant is unlikely to have suffered prejudice as a result of his absence. The trial court continued the hearing until the following Monday when defendant could be present. Defendant presumably could have given the court or counsel any information he had at that time. Even if the court had already reached a tentative decision, it could have reconsidered on the basis of any new information presented. We note also that considerable time elapsed between the date of the motion and Douglas's actual testimony, during which defendant could have investigated Douglas.

## IV.

### JURY-SELECTION ISSUES

1. *Dismissal of defendant's jury-selection expert.*

Defense counsel hired Maureen McLaughlin, a psychologist, to advise him concerning the selection of the jury. He agreed to pay her $500 a day.

During the first day of jury selection, jurors were questioned individually in chambers concerning their views of the death penalty. McLaughlin was present during this voir dire to assist defense counsel. At the start of the second day, the court called counsel and McLaughlin into chambers and told her that "I am not authorizing your services." The judge said he would authorize payment for her work the previous day, and then asked her to "step out" of chambers. Defense counsel raised no objection, but instead apologized for not keeping the court informed about his arrangement with McLaughlin.

If defendant had moved under section 987.9 for funds to hire a jury-selection expert, we could view the judge's statement as a denial of that motion, and inquire whether it was an abuse of discretion. But defendant never made such a motion.[18]

Defendant claims that the judge acted precipitously in ordering McLaughlin to leave his chambers where the jury was being selected. If McLaughlin were willing to work pro bono, or counsel to pay her fees from some other source, she would be entitled to remain and continue to assist in the selection. But defendant did not allege then, and does not now claim, that such an arrangement was feasible.

2. *Limitation on death-qualifying voir dire.*

Concerned about the implications of our discussion in *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 71-75 [168 Cal.Rptr. 128, 616 P.2d 1301], where we explained how the death-qualifying process can bias the jury, the trial court here decided to limit that process as much as possible.[19]

---

[18] Under section 987.9, a motion for expenses must be made by written affidavit, and must be heard by a judge other than the trial judge. Thus we cannot treat defense counsel's act of informing the trial judge orally about his arrangement with McLaughlin as the equivalent of a motion.

[19] We said in *Hovey* that "In a typical death-qualifying voir dire, the judge and the attorneys repeatedly instruct the jurors about the steps leading to the penalty trial and question each prospective juror, oftentimes at considerable length, concerning his or her attitudes

It formulated four specific questions, which were put to all jurors, and refused to permit further questions from counsel. The first two questions inquired about guilt and special circumstances. Question three asked: "Do you have such a conscientious opinion or religious conviction regarding the death penalty that if you found the defendant guilty of murder in the first degree and you found the special circumstances alleged to be true, that you would automatically find the penalty to be life imprisonment without the possibility of parole?" The fourth question asked: "Do you have such a conscientious opinion or religious conviction regarding the death penalty that if you found the defendant guilty of murder in the first degree and the special circumstances herein alleged to be true, that you would automatically find the penalty to be death?" When answers were ambiguous, the judge sometimes asked further questions, but did not permit counsel to ask questions on this subject.[20] Defendant asserts this limitation constitutes reversible error.

Problems stemming from the trial court's ruling arose frequently during the voir dire. Juror Martin, asked whether she would automatically vote in favor of death, responded, "That's hard to say." The court asked no follow-up questions, but observed that the juror's response was not sufficient to

---

about capital punishment. These repeated displays of concern about the death penalty before any evidence of guilt has been presented may prompt the jurors to infer that the court and counsel assume the penalty trial will occur." (Pp. 70-71.) We reviewed a study by Dr. Craig Haney which indicated that jurors who had been through a death-qualifying process were more likely to believe the defendant guilty and to favor the death penalty, and noted his conclusion that " '[t]he more extensive the questioning, the more you would expect to find important differences between the state of mind of jurors who have been through the one process [death-qualification] as compared with those who have been though the other [voir dire without death qualification].' " (P. 79.) We concluded, "[t]his proposition implies a corollary: 'the extent to which [these effects] are minimal will be a function of the extent to which the questioning is minimized.' " (Pp. 79-80.)

[20] The conference at which the court made its ruling was unreported. Later during the voir dire defense counsel asked the judge to explain his ruling to defendant. The judge said, "The case law that guides this court dictates, and I make the ruling, that . . . only certain questions, specific questions, be asked of the jurors having to do with their attitude in regard to the death penalty. And I made that type of ruling, and I've made that clear to the attorneys. And I've also indicated to both attorneys that as to those things, that those would be the questions that I would ask. As for general voir dire . . . of course the code section allows the attorney a reasonable opportunity to make inquiry of the respective jurors for cause."

Defense counsel responded: "Judge, what I'm concerned about, and I think the record should be made clear, is that you've indicated, if I'm interpreting correctly that in reference and regards to the death qualifying questions *that neither Mr. Kay* [the prosecutor] *nor I would be permitted to ask any questions*. It is our position, of course that . . . a . . . capital case is so unique that asking four general questions often is not adequate to really ascertain the thinking process of a particular juror, particularly in view of the fact that the questions which are based on Witherspoon sometimes create problems for an individual to comprehend. . . . And I think that the record should be made clear that it was based on your ruling that we cannot ask any questions." The court replied, ". . . that's true. That's true." (Italics added.)

disqualify her. Defense counsel agreed, but again objected that vague answers to the court's questions did not really reveal the views of the jurors, and the court's ruling did not give attorneys latitude to explore the matter.

Juror Porrazzo, asked whether she would automatically vote in favor of life imprisonment, replied, "Well, the death penalty, I believe in. If you take somebody's life, willfully take somebody's life, that you give up your own." On further questioning from the judge, she agreed that she "would have to really think about it . . . according to what I felt had preceded." In response to the fourth question, whether she would automatically vote for death if she found defendant guilty of first degree murder with special circumstances, she replied, "Well, if all the evidence pointed that way, yes."

The answer appears equivocal: it could mean she would automatically vote for death if the evidence pointed toward guilt with special circumstances, or it could mean she would automatically vote for death if the evidence pointed toward death as the appropriate penalty (although under the latter interpretation the word "automatically" has little meaning). Defense counsel interpreted that answer as an automatic vote for death; the court interpreted it differently. Expressing his frustration at being unable to question the juror, counsel challenged for cause, but the court denied the challenge.

Juror Andry, asked if she would automatically vote for life imprisonment, answered, "Yes, I guess so." The prosecutor challenged for cause. The court told defense counsel that under the rules he could not rehabilitate her, and granted the challenge. Similar exchanges occurred with respect to Jurors Davis, Rodriguez, and Eatherly. Finally, when Juror Staggs, on general voir dire, said that because of her bias against rapists she might go for a "stiffer sentence," defense counsel was not permitted to ask if she would automatically vote for death.

Even under the rule of *People* v. *Edwards* (1912) 163 Cal. 752 [127 P. 58] (overruled prospectively in *People* v. *Williams* (1981) 29 Cal.3d 392 [174 Cal.Rptr. 317, 628 P.2d 869], which broadened the scope of voir dire to permit examination for peremptory challenge), a party was entitled to put questions which might expose a basis for a challenge for cause. Although the trial court's policy is understandable in light of what we said in *Hovey, supra,* 28 Cal.3d 1, it nonetheless appears erroneous in two respects.

First, the judge cannot reserve voir dire for himself and exclude counsel.[21] As we stated in *People* v. *Hughes* (1961) 57 Cal.2d 89, 94-95 [17 Cal.Rptr.

---

[21] In *People* v. *Crowe* (1973) 8 Cal.3d 815 [106 Cal.Rptr. 369, 506 P.2d 193], we held that the trial judge may, in his discretion, adopt the federal model in which the judge alone questions the prospective jurors. The Legislature promptly overruled *Crowe* by amending section

617, 367 P.2d 33]: "[C]ounsel for a defendant in a capital case has the right to question the prospective jurors on *voir dire* for the purpose of ascertaining whether any would vote to impose the death penalty without regard to the evidence in the event of a conviction. . . . In order to intelligently exercise the right to challenge for cause defendant's counsel must be accorded reasonable opportunity to lay a foundation for the challenge by questioning the prospective jurors on *voir dire* to learn whether any entertain a fixed opinion of this nature."[22]

Second, and perhaps more important, the judge did not conduct an adequate voir dire himself. By failing to follow up on meaningless (Juror Martin) or ambiguous (Juror Porrazzo) answers, he placed counsel in an impossible position; counsel had reason to believe the jurors were disqualified, but could not prove it without further questions designed to elicit a clear and unambiguous response. The judge also excused several jurors whose responses suggested an automatic vote for a life sentence, without questions to probe whether the juror was really disqualified.

In defense of the trial court's ruling, the Attorney General relies on *People v. Ketchel* (1963) 59 Cal.2d 503 [30 Cal.Rptr. 538, 381 P.2d 394] and *People v. Nye* (1969) 71 Cal.2d 356 [78 Cal.Rptr. 467, 455 P.2d 395]. Both cases appear distinguishable. In *Ketchel* (which was tried before *Witherspoon v. Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]) the judge asked the jurors if they had any belief "that would prevent you from voting for the death penalty simply because of the fact that it is the death penalty?" He excused those jurors who raised their hand. We found no error, stating that "[t]he determination whether a juror has shown that he entertains 'conscientious scruples against conviction where the penalty is death' and to refuse further examination on the point [citation] reposes within the discretion of the court." (59 Cal.2d at p. 529.) In *Nye, supra,* 71 Cal.2d 356, the judge also excused prospective jurors each of whom had "made it unmistakably clear that he would not vote in favor of the death penalty under any circumstances, no matter what evidence was presented." (P. 363.) We upheld the court's refusal to allow defense counsel to question those jurors for the purpose of rehabilitation, citing *Ketchel. (Ibid.)*

---

1078 to provide that the judge "shall permit reasonable examination of prospective jurors by counsel for the people and for the defendant, such examination to be conducted orally and directly by counsel."

[22] Our most recent decision to discuss limitation on voir dire was *People v. Fuentes* (1985) 40 Cal.3d 629 [221 Cal.Rptr. 440, 710 P.2d 240]. Defense counsel sought to ask jurors whether they believed an accomplice who only aided and abetted a robbery, and did not intend to kill, should be punished as severely as the actual killer. We characterized the proposed questions as relevant to the felony-murder special circumstances, and held the trial court erred in excluding that area of inquiry. (Pp. 638-639.) Because the special circumstance finding was reversed on other grounds, we did not reach the question of prejudice.

Both cases permit the court to excuse a juror when that juror has given an unequivocally disqualifying answer. Neither permitted a court to prohibit voir dire of jurors who gave equivocal answers. *Nye* observed expressly that the trial judge had excused only those jurors whose answers made their disqualification unmistakably clear, and said there was no need for further examination of those particular jurors. (71 Cal.2d at p. 364.) We do not question a judge's discretion to decide that a juror's disqualification is so clear that further voir dire is pointless, and to excuse the juror, but this does not justify denying voir dire when the juror's answers are equivocal and the juror is retained.[23]

We turn, therefore, to the question of prejudice. Defendant calls our attention to *People* v. *Carmichael* (1926) 198 Cal. 534, 547 [246 P. 62], which appeared to find improper limitation on voir dire reversible per se. *Carmichael* said that "[n]o authority has been called to our attention which can be construed as holding that section 4½ of article VI [now art. VI, § 13] of the constitution can be relied upon to sustain the judgment herein. . . . The ruling of the court in thus limiting the appellant in his examination of the jurors was, in our opinion, the deprival of the appellant of a fundamental right,—a right to be tried by an impartial jury. It was never intended by this provision of the constitution to take from the defendant in a criminal action his fundamental right to a jury trial or in any substantial manner to abridge this right." (*Carmichael,* p. 547.)

Subsequent cases, however, have steadily drawn back from the use of a per se standard. In *People* v. *Estorga* (1928) 206 Cal. 81 [273 P. 575], the court affirmed a judgment, despite erroneous restriction of voir dire, because defendant confessed from the stand, "the result was just, and . . . would have been reached if the error had not been committed." (P. 85.) *People* v. *Barrett* (1929) 207 Cal. 47 [276 P. 1003], then confirmed the *Estorga* holding, but declined to apply it to a case in which the credibility of prosecution witnesses was open to question. After a 50-year gap in which we have found no reported cases, this court again addressed the subject in *People* v. *Williams, supra,* 29 Cal.3d 392, 412, and declared that "[a]lthough in many contexts a procedure depriving defendant of the right to secure an impartial jury necessarily dictates reversal (see, e.g., *People* v. *Wheeler*

---

[23] The Attorney General points out that the defense was permitted to ask a broad variety of questions on general voir dire. It was not, however, permitted to ask questions relating to views on capital punishment. For example, during the general voir dire of Juror Staggs, she said that if defendant committed rape, "I think I would probably be more inclined to go for a stiffer sentence, possible." Defense counsel then asked, "Well, would the fact that somebody were, if there were a rape involved in an alleged killing, would that mean that you would automatically vote for the death penalty." The district attorney objected. He started to say "that's the type of question that you . . ." but the judge interrupted and sustained the objection.

(1978) 22 Cal.3d 258, 283 [148 Cal.Rptr. 890, 583 P.2d 748]; *People* v. *Carmichael, supra,* 198 Cal. 534, 547), that standard should not apply if the potential for bias relates only to a particular doctrine of law." In the most recent decision, *People* v. *Kronemyer* (1987) 189 Cal.App.3d 314 [234 Cal.Rptr. 442], defendant, an attorney, was accused of defrauding a senile client. The court restricted defense counsel's voir dire on the jurors' experience with senility. The Court of Appeal found error, but declined to reverse because the court permitted some inquiry into the area, the defense voir dire of jurors was extremely cursory, and the defense exercised only one peremptory challenge.

This list of exceptions to the per se rule of *Carmichael, supra,* 198 Cal. 534, convinces us that the rule itself should be abandoned. To categorize any erroneous restriction as the denial of the right to jury trial implies reversal for the most trivial of errors, and invites the creation of more and more exceptions to the rule. Judicial limitations on voir dire vary in scope and severity, and in their impact on the jury selection and the ultimate outcome of trial. ■ We see no reason why the courts should not recognize those differences, and limit reversals to those cases in which the erroneous ruling affected defendant's right to a fair and impartial jury.

In adopting this standard to measure reversible error, we follow our recent decision in *People* v. *Coleman* (1988) 46 Cal.3d 749 [251 Cal.Rptr. 83, 759 P.2d 1260]. In that decision we offered a number of reasons for rejecting the claim that an erroneous denial of a challenge for cause was reversible per se; the most important, we said, was that "the error here did not result in a jury particularly apt to impose the death penalty, and there is no indication that the jury before which defendant was tried was anything other than fair and impartial." (46 Cal.3d at p. 768.) *Coleman* in turn relied on the decision of the United States Supreme Court in *Ross* v. *Oklahoma* (1988) 487 U.S. 81 [101 L.Ed.2d 80, 108 S.Ct. 2273], which also involved the erroneous denial of a challenge for cause, compelling defendant to remove the biased juror by peremptory challenge. The Supreme Court reasoned that the right of peremptory challenge is not itself of constitutional dimension; it is a means to protect the constitutional right to an impartial jury. (See *Ross, supra,* 487 U.S. at p. 88 [101 L.Ed.2d at p. 90, 108 S.Ct. at p. 2278].) Since defendant did not claim that any of the 12 jurors who heard the case were subject to challenge for cause, or were not impartial, his right to an impartial jury was not abridged.

The right to voir dire, like the right to peremptory challenge at issue in *Coleman, supra,* 46 Cal.3d 749, and *Ross, supra,* 487 U.S. 81, is not a constitutional right but a means to achieve the end of an impartial jury. ■ Here certain prospective jurors gave insufficient or ambiguous an-

swers to questions relating to their views on capital punishment, so the parties should have been permitted to ask follow-up questions. But every one of those jurors was removed by prosecution or defense challenge. When the jury was finally selected, defendant did not claim that any juror was incompetent, or was not impartial. We therefore find no prejudicial error.

### 3. *Denial of defendant's challenges for cause.*

The defense objected to the judge's rulings denying its challenges for cause to five jurors, but used peremptory challenges to dismiss those jurors. When defendant had used all 26 peremptory challenges given him by statute (former § 1070), the judge observed that defense counsel had said he intended to exercise all his challenges to protect the record. The judge then announced that, although he was satisfied with his rulings on challenges for cause, "I have decided . . . to give you two additional peremptories in addition to the 26 based on an abundance of caution." The prosecution requested two additional challenges also, to which the court agreed.

The defense exhausted its additional challenges. At that point the prosecution had used 21 challenges. It dismissed five additional jurors, bringing its total to twenty-six, but did not utilize the two extra challenges given it by the judge.

Defendant now renews his claim that the court erred in denying the challenges for cause to five jurors. Defendant maintains that a single erroneous denial of a challenge for cause is prejudicial; the Attorney General argues that since defendant received two extra peremptory challenges, he must show that at least three challenges were improperly denied.

■ The denial of a peremptory challenge to which defendant is entitled is reversible error when the record reflects his desire to excuse a juror before whom he was tried. (*People v. Armendariz* (1984) 37 Cal.3d 573, 584 [209 Cal.Rptr. 664, 693 P.2d 243].) Since the erroneous denial of a challenge for cause compels the defense to use a peremptory challenge, a similar analysis applies to denial of a challenge for cause. (*People v. Coleman, supra,* 46 Cal.3d 749, 770-771.) Defendant must show that the error affected his right to a fair and impartial jury. (P. 771.)

Thus, defendant must show that he used a peremptory challenge to remove the juror in question, that he exhausted his peremptory challenges (see *Coleman, supra,* 46 Cal.3d 749, 770 and cases there cited) or can justify his failure to do so (*People v. Box* (1984) 152 Cal.App.3d 461 [199 Cal.Rptr. 532]), and that he was dissatisfied with the jury as selected. But if he can

actually show that his right to an impartial jury was affected because he was deprived of a peremptory challenge which he would have used to excuse a juror who sat on his case, he is entitled to reversal; he does not have to show that the outcome of the case itself would have been different. (See *People* v. *Helm* (1907) 152 Cal. 532, 535 [93 P. 99]; *People* v. *Diaz* (1951) 105 Cal.App.2d 690, 696-699 [234 P.2d 300].)

 This reasoning necessarily implies that an erroneous denial of a challenge for cause can be cured by giving the defendant an additional peremptory challenge. One older case, *People* v. *Freeman* (1891) 92 Cal. 359, 365-366 [28 P. 261], so holds. More recent cases which speak of defendant's obligation to advise the court of his dissatisfaction with the jury assume that the court, so advised, could fashion an appropriate remedy (see, e.g., *People* v. *Crowe, supra,* 8 Cal.3d 815, 832), and the grant of additional peremptory challenges would seem to be such a remedy.[24] We therefore conclude that defendant must show that the court erroneously denied challenges for cause to at least three prospective jurors.

We therefore turn to an analysis of the jurors in question, bearing in mind that in view of defendant's two additional challenges, it is necessary for him to show erroneous rulings affecting three jurors to prove prejudice.

(a) *Sina Gage.*

During voir dire, Juror Gage stated that "before I ever came here, I felt in my head he was already guilty." This opinion was based on reading newspaper accounts of the case. The mother of one of the victims worked in the same building as Gage, but there is no indication that they knew each other or had even met. Gage remembered hearing some conversation that included the fact that a victim's mother worked in the building, but recalled no other details of the conversation.

Section 1076 provides that "[n]o person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to the jury, founded upon public rumor, or statements in public journals, circulars, or other literature, or common notoriety if upon his or her declaration, under oath or otherwise, it appears to the court that he or she can and will, notwithstanding that opinion, act impartially and

---

[24] Defendant points out that the court also granted the prosecutor two additional peremptory challenges, and speculates that this may have affected defense counsel's tactics. Since the prosecutor already had five challenges remaining, we doubt that the effect was signficant. If the prosecutor had exercised the two additional challenges, however, we would face a quite different situation, since the prosecutor did not claim that the court had erroneously denied any of his challenges for cause.

fairly upon the matters to be submitted to him or her." ▮▮▮ The challenge to Gage is governed by this section, since she had formed an opinion of the case based upon accounts in a public journal.[25] The critical question is whether Gage properly declared that she could act impartially and fairly.

Gage's own testimony is conflicting. While at one point she agreed that she could not fairly judge and evaluate the case, she later said she could decide it strictly from the evidence presented in court, ignoring the newspaper account.

As stated in *People* v. *Linden* (1959) 52 Cal.2d 1, 22 [338 P.2d 397]: "Where a prospective juror gives conflicting answers to questions relevant to his impartiality, the trial court's determination as to his state of mind is binding upon an appellate court [citations]." *People* v. *Ghent* (1987) 43 Cal.3d 739, 768 [239 Cal.Rptr. 82, 739 P.2d 1250] further declares that "where equivocal or conflicting responses are elicited . . . , the trial court's determination to his true state of mind is binding on an appellate court."

This principle requires us to uphold the ruling denying the challenge to Juror Gage. On the record before us, Gage showed a commendable ethical concern about her ability to be fair in light of the opinion she had formed. When directly questioned on her ability to reach a decision strictly based on the evidence presented in court, she indicated her belief that she could do so. The trial court cannot on this record be said to have acted improperly in denying the challenge for cause.

(b) *Cheryl Staggs.*

Juror Staggs had heard something about the case on television and in the newspaper. She recalled that the case involved people being picked up and raped in a van, and also that pictures were taken of the people who were killed. Staggs told the judge that she had worked at a rape crisis center, and did not believe she would be impartial in a case involving charges of rape.[26] Her voir dire presents no unqualified statement that she actually felt that she could be fair and impartial in the penalty phase of this case.

Defense counsel asked Staggs if it was her position that, because of "your strong feelings about victims of rape, that you would be unable to really

[25] It does not appear that Gage formed any actual opinion based on the office conversation, but simply felt bad for the mother. In any case, this remote sort of office gossip would fall within the statute as public rumor.

[26] Section 1076 is not directly in point, since Staggs was not so much prejudiced against the defendant as she was against the offense itself. (See *People* v. *Harrison* (1910) 13 Cal.App. 555 [110 P. 345].)

fairly and impartially judge and evaluate such a situation?" She responded with an unqualified "yes." The prosecutor, attempting to rehabilitate her, could obtain only a statement that she would act impartially at the guilt phase. The judge asked if she would be willing to listen to the evidence and be a fair and impartial juror; she said that "I could try, but I believe it would be difficult. . . . [O]ne of the questions I do remember was about listening to gruesome testimony. And I think I would have a tendency to have a saturation point perhaps below what other people—an anger point, perhaps, or something to that effect. So that I wouldn't be listening wholly to the evidence."

, In short, Juror Staggs said she did not think she could be impartial at the penalty phase, and when asked if she would listen to the evidence and judge fairly, replied that she might not be able to listen to all the evidence. On this record we conclude that the trial court erred in denying the challenge for cause.

(c) *Christoph Hein.*

Juror Hein formed an opinion of the case based on reading newspaper accounts. His opinion thus falls under those covered by section 1076. In response to a question whether he could put that opinion out of his mind and decide the case on the evidence, he replied, "I wish I could say yes, okay, but I really don't think so." Following a lecture by the court on the duty of jurors, Hein said he would try to be impartial, "[b]ut I would have a very difficult time . . . because I've got preconceived ideas on it already." Defense counsel asked if "what you're telling us is that because of what you have read, you have preconceived notions which would be most difficult if not impossible to put out of your mind?" Hein responded, "That's correct."

, The trial judge denied a defense challenge for cause because the juror "just said he would have a difficult time. He didn't say that he couldn't do it." But this reasoning is inconsistent with section 1076, which provides that if a juror has an opinion based upon public journals, he is qualified only if he *affirmatively declares that he can and will act impartially.* A declaration that he will try to be impartial, but doubts that he can succeed, is insufficient. We conclude that the court should have sustained the challenge for cause.

(d) *Lynn Kuriki.*

 Juror Kuriki had not been exposed to media accounts of the case, and had no preformed opinions. During voir dire, Kuriki stated that she did not think that she could be fair, because she would get emotionally in-

volved. This feeling apparently stemmed from having a 15-year-old daughter, and the number and the nature of the charges.

Kuriki, however, also stated that she believed she had the ability to follow the court's instructions and base her decision solely on the evidence as it comes from the witness stand. She also spontaneously stated that she believed that a person is innocent until proven guilty.

These conflicting answers present the same issue as arose with Juror Gage. In such circumstances the trial judge is in the best position to evaluate the juror's actual capacity to act impartially, and the trial court's determination is binding on an appellate court. (*People* v. *Ghent, supra,* 43 Cal.3d 739, 768; *People* v. *Linden, supra,* 52 Cal.2d 1, 22.)

Any juror sitting in a case such as this would properly expect the issues and evidence to have an emotional impact. A juror is not to be disqualified for cause simply because the issues are emotional. Disqualification for cause must ultimately rest on the existence of preconceptions which will prevent a decision from being reached based on the evidence and the instructions of the court. Here, there is no significant evidence of preconceptions which would bias the deliberations, and a clear statement of the ability to decide on the basis of the evidence. The trial court acted properly in denying this challenge for cause.

(e) *Marguarite Porrazzo.*

We have previously discussed the voir dire of Juror Porrazzo, and noted that her answer to a question asking whether she would automatically vote in favor of death was equivocal. Because it was equivocal, the judge did not err in finding it insufficient to require her dismissal for cause.

4. *The prosecutor's use of peremptory challenges.*

Late in the voir dire of the jury defense counsel objected that the prosecutor was exercising his challenges on a basis showing group bias. (See *People* v. *Wheeler, supra,* 22 Cal.3d 258, 280.) The record showed that the prosecutor challenged 5 of 6 Black jurors (83.3 percent) and 21 of 60 White jurors (35 percent). Defendant claimed that these figures demonstrate a prima facie case, shifting to the prosecutor the burden to justify the challenges. The court afforded the prosecutor a chance to respond—the prosecutor denied the charge—and then denied defendant's motion.

Defendant argues that by offering the prosecutor a chance to respond to the motion, the court in effect found that defense counsel had made a prima

facie showing of group bias, thus shifting to the prosecutor the burden to justify his challenges. We do not so interpret the judge's ruling. He did not call upon the prosecutor to explain his challenges, but to respond to the defense motion. When the judge then denied the motion, he did so on the ground that the defense had not made out a prima facie showing of group bias, not that the prosecutor had rebutted such a showing.

To establish a prima facie case, the defendant "must show a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias." (*People* v. *Wheeler, supra,* 22 Cal.3d 258, 280.) In determining whether the defendant has made such a showing, trial judges may "bring to bear on this question their powers of observation, their understanding of trial techniques, and their broad judicial experience." (*Id.*, at p. 281.)

As in *People* v. *Dominick* (1986) 182 Cal.App.3d 1174 [227 Cal.Rptr. 849] and *People* v. *Rousseau* (1982) 129 Cal.App.3d 526 [179 Cal.Rptr. 892], the record here suggests grounds upon which the prosecutor might reasonably have challenged the five Black jurors he excused. Juror Thompson had studied psychology and, on voir dire, said, "I really feel that I would try to be an amateur psychologist, psychiatrist, if I was in this case, in due fairness." Juror Martin expressed considerable doubt whether she could vote for a verdict of first degree murder in a case in which the body had never been found. Juror Weaver initially said that she would automatically return a verdict of life imprisonment; she later equivocated, and the judge denied the prosecutor's challenge for cause. Juror Walker opined that in a death penalty case, the standard of proof should not be that of reasonable doubt, but absolute proof. Juror Mims was uncertain whether he could return a death verdict and told the judge, "If you ask me if I could kill somebody, I don't know. So I can't just sit here and tell you." Under these circumstances, we believe the trial court did not err in finding no prima facie showing of group bias.[27]

V.

## GUILT PHASE ISSUES

Defendant raises 40 guilt phase issues. We omit those that are not of arguable merit, or which have been resolved by opinions filed subsequent to briefing.

---

[27]Defendant argues that the prosecutor did not challenge White jurors with similar problems. We have reviewed the record, and while we find statements by White jurors similar to those by the challenged jurors, in each case the statement of the challenged juror took a form more likely to inspire a prosecution challenge.

1. *Norris's plea bargain.*

Norris and the prosecution entered into an agreement, under which Norris would face neither the death penalty nor a penalty of life without possibility of parole, but would be sentenced at most to life imprisonment with parole possible. Norris in return agreed to help the sheriff to find the bodies of the victims and physical evidence relating to the murders, to testify at defendant's trial, and to plead guilty to five counts of murder without special circumstances, two counts of rape, and one of robbery. The parties carried out their bargain, and Norris is presently serving a life sentence.

In *People* v. *Medina* (1974) 41 Cal.App.3d 438 [116 Cal.Rptr. 133], the Court of Appeal held that a plea bargain was invalid if it required the witness to testify to a particular version of the facts, and that testimony given pursuant to that bargain was tainted. Later in *People* v. *Fields* (1983) 35 Cal.3d 329, 361 [197 Cal.Rptr. 803, 673 P.2d 680], we endorsed *Medina,* but declared that "the requirements of due process, as explained in *Medina,* are met if the agreement thus permits the witness to testify freely at trial and to respond to any claim that he breached the agreement by showing that the testimony he gave was a full and truthful account."

██ Defendant contends that the agreement between the prosecution and Norris does not meet these criteria. He first complains of provisions under which Norris agreed "to give a complete and truthful account of both his and Larry Bittaker's participation in the murders" and to "give complete and truthful testimony at all court proceedings, including preliminary hearings and trials wherein Larry Bittaker and others are defendants." Defendant suggests that these provisions required him to testify that defendant participated in the murders, even if that testimony were untrue. We think this is not a reasonable interpretation of the agreement. Norris was required to testify truthfully. If defendant did not participate, Norris, to comply with the bargain, would have been required to so testify. Nothing in the bargain requires or permits Norris to testify falsely against defendant.

Defendant further complains that the agreement provides that "[t]he District Attorney's Office of the County of Los Angeles shall have authority and discretion to determine whether or not Roy Lewis Norris testified truthfully and completely . . . . If requested by Roy Lewis Norris, Superior Court Judge Edward Hinz of the Southwest Judicial District shall determine whether or not there has been an abuse of such authority and discretion." Under the agreement, if the district attorney finds that Norris did not testify truthfully, and Judge Hinz finds no abuse of discretion, the bargain is set aside, and the prosecution may seek the death penalty.

The provision in the agreement providing for judicial review to determine whether the district attorney abused his discretion is troubling. The legal principles, established in the cases discussed earlier, are clear: if Norris testified fully and truthfully, he is entitled to the benefit of his bargain; if not, the district attorney has discretion to revoke the bargain. We do not believe they can be altered by contract so as to limit the court to reviewing the district attorney's discretionary finding as to whether Norris told the truth.

As we have noted, the agreement called for full and complete testimony. We do not believe that the language concerning the scope of judicial review in this case presents any significant risk of inducing Norris to give false or incomplete testimony. Thus while we advise against language in a plea bargain which purports to give the district attorney, and not the court, discretion to determine whether the witness testified truthfully, we find no reversible error.

2. *Availability of the original Ledford tape.*

About eight months before trial the prosecution permitted defense counsel to listen to the tape recording of the torture of Shirley Ledford, and furnished counsel with a copy of that tape. During the presentation of the prosecution's case at trial, the defense asked permission from the prosecution to make a better copy.[28] The prosecution objected to taking the original tape from the court, and the court refused to permit any copying. The defense then filed a formal motion for copy and a continuance to permit testing of the copy; the court denied the motion.

It is clear that defendant's motion was untimely. The time for obtaining copies of evidence and submitting them to expert examination is before trial, not during the prosecution's case. Even though defendant's original request, unlike his later motion, was not accompanied by a request for continuance, the trial court could reasonably fear that granting the request would delay proceedings.

3. *Testimony of Jan Malin.*

Defendant objects to testimony concerning his attempt to abduct Jan Malin because he was not charged in this proceeding with any crime against Malin. Defendant was charged with conspiracy to kidnap women, however,

[28] The prosecution claimed that the background noise on the tape was the engine of defendant's van, and showed that defendant was driving the van, and thus present, while Norris tortured Ledford. Appellate counsel argues that with a better copy, an expert might be able to show some other origin for the background noise.

and this incident was listed as an overt act in support of the charged conspiracy. Evidence of the Malin incident was excluded at the preliminary examination but defense counsel did not move to dismiss or strike the accompanying overt-act allegation. (See § 995.)

 Defendant now contends that since this evidence was excluded at the preliminary examination, the accompanying overt-act allegation should have been dismissed on a motion under section 995. Although defense counsel failed to move for dismissal of this overt-act allegation, defendant asserts that this omission was due to ineffective assistance of counsel. But whether or not counsel was ineffective in this regard—an issue which cannot be decided upon the present record—in light of counsel's failure to move to strike the overt-act allegation, the trial court did not err in admitting the evidence. (We express no opinion as to whether the evidence might also be admissible to prove identity under Evidence Code section 1101.)

### 4. *Admissibility of "The Last Ride."*

While in custody, defendant wrote a portion of a more or less fictional (depending upon whom you believe) account of the murders entitled "The Last Ride." He showed the book to a newspaper reporter who wrote an article describing it. According to defendant's offer of proof, Sergeant Budds asked defendant about the book,[29] and he facetiously asked if Budds would like "to read and correct it." Budds declined to do so. A few days later, however, he asked defendant if he could read and review it. Defendant "stated that in submission to authority only he would let him see it and for the limited purpose of correcting it and that it not be disclosed to anyone or used by anyone for any purpose." The prosecution did not introduce the book in its case-in-chief, but made use of it, over defense objection, in cross-examining defendant.

The trial court denied defendant's objection as untimely. Defendant concedes here that the objection was untimely to the extent it was based on a theory that defendant submitted to authority and did not voluntarily consent to the seizure of the manuscript. (§ 1538.5, subd. (h).) He maintains, however, that the objection was also based upon violation of his Fifth and Sixth Amendment rights, because Sergeant Budds asked him for the manuscript without giving *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) warnings and without defendant's counsel being present.

Defendant's argument mistakenly assumes that his consent was essential to the validity of the seizure of the manuscript. But defendant had no

---

[29] The Attorney General's brief alleges that Budds visited defendant some time after defendant's conversation with the reporter, but the record does not give any dates or sequence of events.

reasonable expectation of privacy in property within his jail cell either under federal law (see *Hudson* v. *Palmer* (1984) 468 U.S. 517, 526 [82 L.Ed.2d 393, 402-403, 104 S.Ct. 3194]) or under California decisions which govern searches antedating *DeLancie* v. *Superior Court* (1982) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142] (see *People* v. *Valenzuela* (1984) 151 Cal.App. 3d 180, 189 [198 Cal.Rptr. 469] and cases there cited). Since Budds could have seized the manuscript without asking for or receiving consent, the issues defendant raises are immaterial to the validity of the seizure.

5. *Evidence of defendant's 1974 assault.*

On cross-examination, the prosecutor asked defendant why he had not objected when Norris abandoned Andrea Hall in the mountains. Defendant replied that he was intimidated by Norris. The prosecutor asked, "in fact, Mr. Bittaker, Mr. Norris was afraid of you, isn't that true?" Defendant responded that Norris had training in martial arts. The prosecutor then asked, "But you're the one that almost killed a person before with a knife. Is that true?" The court overruled defendant's objection. The prosecutor then put on further evidence of defendant's 1974 assault on a store clerk.

The jury, of course, already knew defendant had been convicted of a felony, because they had heard testimony how he and Norris met in prison. They did not know the nature of the felony. ▮▮▮ Defendant claims that because the 1974 offense had almost no marks of similarity with the charged crimes, evidence showing the nature of that offense was inadmissible under Evidence Code section 1101. Section 1101, subdivision (a), however, prohibits the use of prior specific conduct only "when offered to prove [defendant's] *conduct* on a specified occasion." (Italics added.) The prosecutor offered the evidence to prove defendant's state of mind—that defendant did not feel intimidated by Norris—rather than defendant's conduct on any particular occasion. The evidence was admissible.

6. *Barring mention that Norris had been adjudicated a mentally disordered sex offender.*

▮▮▮ The court refused to permit defense counsel to mention in his opening statement that Norris had been adjudicated a mentally disordered sex offender (MDSO). The prosecutor's objection was that "laypeople . . . have no idea what that means, it connotes a lot of things, we're going to get into a lot of side issues getting experts to testifying about what mentally disordered sex offender means." The court's ruling was apparently based on those grounds.

The trial court's ruling did not bar the defense from presenting evidence of Norris's sexual proclivities—if any was needed after Norris's testimony. It barred only proof of his classification. Since that classification is a technical one, which would have to be explained to the jury, and when explained would add little to the case, we believe the trial court's ruling was within its discretion.

7. *Exclusion of evidence of crimes of Norris and Jackson.*

■ When examining Joe Jackson, defense counsel asked him whether he and Norris were involved in an attempted rape in April of 1979. The court sustained the prosecutor's objection.

Defendant certainly had a right to attempt to show that Norris and Jackson had committed some of the crimes of which he was charged. But evidence that they committed some other crime would ordinarily be inadmissible. Defendant's question to Jackson did not suggest any relationship between the attempted rape in April and the charged crimes that would render the evidence admissible, and when the court sustained an objection defendant made no offer of proof. We therefore find no error in the ruling.

8. *Impeachment of Christina Dralle.*

■ Christina Dralle testified that when she rejected defendant's advances, he pulled a gun and said, "you wouldn't argue if I pulled the trigger." Defense counsel sought to impeach her by evidence that she had made false charges of sexual molestation against two other men. The trial court upheld an objection under Evidence Code section 352. Its ruling is not an abuse of discretion. The value of the evidence as impeachment depends upon proof that the prior charges were false. This would in effect force the parties to present evidence concerning two long-past sexual incidents which never reached the point of formal charges. Such a proceeding would consume considerable time, and divert the attention of the jury from the case at hand.

9. *Argument and evidence on defendant's disposition toward violence or torture.*

■ The prosecutor offered considerable evidence, generally without objection or request for limiting instructions, which tended to show defendant's psychological disposition toward acts of violence and his interest in sexual torture. The evidence included testimony concerning defendant's discussion of his sexual fantasies with Richard Shoopman, various sadomasochistic and bondage magazines found in defendant's possession, and evi-

dence that defendant wrote a threatening letter to the judge who presided over his prior assault trial. The prosecutor relied on this and other evidence to argue defendant's psychological proclivities.

Defendant's failure to object to inadmissible evidence, or to request limiting instructions when evidence was admissible for other purposes, bars him from raising the issue on appeal. (See *People* v. *Baines* (1981) 30 Cal.3d 143, 149 [177 Cal.Rptr. 861, 635 P.2d 455].) Likewise his failure to object to the allegedly improper argument bars that issue on appeal. (See *People* v. *Green* (1980) 27 Cal.3d 1, 28 [164 Cal.Rptr. 1, 609 P.2d 468].)

10. *The prosecutor's question concerning a letter to Shoopman.*

Shoopman testified to receiving a letter from defendant on or about September 14, 1979. On cross-examination the prosecutor asked him, "Isn't it a fact, Mr. Shoopman, that he [defendant] wrote you about the rape and killing of a girl in the mountains before September 14?" Shoopman denied receiving such a letter, and the prosecutor did not mention the matter further.

■ Defendant invokes the rule that it is "improper to ask questions which clearly suggested the existence of facts which would have been harmful to defendant, in the absence of a good faith belief by the prosecutor that the questions would be answered in the affirmative, or with a belief on his part that the facts could be proved, and a purpose to prove them, if their existence should be denied." (*People* v. *Lo Cigno* (1961) 193 Cal.App.2d 360, 388 [14 Cal.Rptr. 354], quoted in *People* v. *Perez* (1962) 58 Cal.2d 229, 241 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946].) The problem in applying this rule is that it makes the issue turn on the prosecutor's good faith, and the record will rarely contain evidence bearing on that matter. In the present case, there is evidence that Shoopman received letters from defendant which he destroyed, but we have no information as to the contents of those letters, or what the prosecutor knew of their contents. Neither can we determine whether the prosecutor, at the time he asked the question, intended to prove the fact at issue. One might infer lack of intent from the fact that the prosecutor did not introduce evidence to prove the content of the destroyed letter, but one can readily imagine that by the time he could offer rebuttal evidence the prosecutor might have concluded that such additional evidence was unnecessary. On the record before us, misconduct has not been demonstrated.

11. *Questions and comment on defendant concealing evidence.*

On cross-examination defendant admitted that he had hidden a number of photographs and one tape by burying them at Forest Lawn Cemetery. He

refused to say exactly where he buried them and, despite being found in contempt of court, persisted in that refusal. The prosecutor returned again and again to this topic, asking defendant nine times where the photographs were; each time defendant refused to reveal their location. At closing argument the prosecutor suggested that the photographs and tapes may show scenes of torture or murder.

■ Defense counsel argues that the prosecutor was badgering defendant, but when a defendant admits to concealing evidence, and defies a court order to reveal its location, surely the prosecutor has considerable latitude in questioning him on the matter. Defendant also argues that the prosecutor's closing argument was contrary to the evidence, since Norris and others who had seen the photographs said they described only scenes of sexual activity, not torture. But when a defendant conceals evidence the prosecutor can argue the inference that the evidence was unfavorable to defendant. (See *People* v. *Redmond* (1981) 29 Cal.3d 904, 910 [176 Cal.Rptr. 780, 633 P.2d 976].) Thus the prosecutor here could reasonably argue that if the photographs supported defendant's version of the facts, defendant would not continue to conceal them.

12. *Instructions on the use of prior felony convictions to impeach.*

■ The trial court instructed the jury that in determining the credibility of a witness it could consider prior felony convictions. (CALJIC No. 2.20.) The problem is that the jury had heard evidence of some felony convictions which, under the law at time of trial, would not be admissible to impeach. It had learned of defendant's prior conviction for assault with a deadly weapon, and Shoopman's prior conviction for murder. Prosecution witnesses were equally tainted: the jury learned of Norris's prior rape conviction and Lloyd Douglas's convictions for manslaughter and burglary.

Under *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1], which states the law governing defendant's trial, a felony conviction was admissible to impeach only if the offense bore upon veracity. (See *People* v. *Rist* (1976) 16 Cal.3d 211, 219 [127 Cal.Rptr. 457, 545 P.2d 833]; *People* v. *Delgado* (1973) 32 Cal.App.3d 242, 250 [108 Cal.Rptr. 399].) Of the convictions brought before the jury, only Douglas's conviction for burglary would meet that test. Thus the court should either have limited its instruction to convictions bearing on veracity or, when admitting the evidence, admonished the jury that it could not be used to impeach the credibility of the witness. Since the error is not of constitutional dimension, the appropriate test of prejudice is the "reasonable probability" test set out in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. In light of the overwhelming evidence of defendant's guilt, we find no reasonable probability

that, absent the error in question, the jury would have reached a different result.

13. *Instructions that Norris was an accomplice.*

■ The court instructed the jury that Norris was an accomplice as a matter of law, and his testimony required corroboration. This instruction was legally correct. We have, however, cautioned that "where a codefendant has made a judicial confession as to crimes charged, an instruction that as a matter of law such codefendant is an accomplice of other defendants might well be construed by the jurors as imputing the confessing [co]defendant's foregone guilt to the other defendants." (*People* v. *Hill* (1967) 66 Cal.2d 536, 555 [58 Cal.Rptr. 340, 426 P.2d 908]; see *People* v. *Valerio* (1970) 13 Cal.App.3d 912, 924 [92 Cal.Rptr. 82]; *People* v. *Richardson* (1960) 182 Cal.App.2d 620 [6 Cal.Rptr. 61].) Under the circumstances of this case, however, there is no significant danger that the jury would impute Norris's admitted guilt to defendant.

14. *Instructions on false imprisonment.*

■ Defendant argues that the court should have instructed on false imprisonment as a lesser included offense of kidnapping. There was evidence that all of the victims except Schaefer voluntarily entered defendant's van. Norris testified, however, that all were immediately subdued, and then transported a considerable distance against their will. Defendant testified that none of the victims was restrained involuntarily in his presence. There is no evidence that any victim went voluntarily to the place of her death, and only then was restrained against her will. Thus there is no evidence to support an instruction on the crime of false imprisonment.

15. *Instructions on torture murder.*

■ The trial court instructed the jury that it could find first degree murder based on the infliction of torture if two requirements were met: "(1) the act or acts which cause the death must involve a high degree of probability of death, and (2) the defendant must commit such act or acts with a wilful, deliberate and premeditated intent to inflict extreme and prolonged pain." Defendant claims such instructions are incomplete because they omit the purpose of the torture.

In *People* v. *Tubby* (1949) 34 Cal.2d 72, 76 [207 P.2d 51], we defined murder by torture as requiring an intent to cause cruel suffering "either for the purpose of revenge, extortion, persuasion, or to satisfy some other untoward propensity." (P. 77.) *People* v. *Steger* (1976) 16 Cal.3d 539 [128

Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206], however, omitted mention of the purpose of the torture, and defined it as "murder conmitted with a wilful, deliberate, and premeditated intent to inflict extreme and prolonged pain." (P. 546.)

Six months after we filed *People* v. *Steger,* however, *People* v. *Wiley* (1976) 18 Cal.3d 162 [133 Cal.Rptr. 135, 554 P.2d 881] quoted *Tubby, supra,* 34 Cal.2d 72, with approval (18 Cal.3d at pp. 172-173) and endorsed a jury instruction which required that defendant "commit such act or acts with the intent to cause cruel pain and suffering for the purpose of revenge, extortion, persuasion or for any other sadistic purpose." (P. 168.) We explained in a footnote that *Steger* did not define all the elements of murder by torture, but was concerned only with establishing that the act of torture must be premeditated. (18 Cal.3d at p. 173, fn. 4.) A later decision, *People* v. *Davenport* (1985) 41 Cal.3d 247, 267 [221 Cal.Rptr. 794, 710 P.2d 861], endorsed the *Wiley* definition of murder by torture, and relied upon it to cure deficiencies in the instructions on torture-murder special circumstances.

When defendant was tried in 1981, the court apparently overlooked both *Wiley, supra,* 18 Cal.3d 162, and the CALJIC instruction which was based on *Wiley,* and instructed in the language of *People* v. *Steger, supra,* 16 Cal.3d 539. We agree with defendant that this instruction was erroneously incomplete. It is apparent, however, that defendant was not prejudiced under any applicable standard of prejudice, for while defendant disputes how many victims were tortured, it is undisputed that whatever torture was inflicted was done for a "sadistic purpose."

## VI.

### SPECIAL CIRCUMSTANCES ISSUES

Defendant challenges five of the thirty-eight special circumstance findings. He objects to the finding that Lamp was intentionally killed because she was a witness to a crime. He points out that this special circumstance applies only if "the killing was not committed during the commission . . . of the crime to which he was a witness" (§ 190.2, subd. (a)(10)), and argues that the crimes Lamp witnessed—the kidnapping, rape, and murder of Gilliam—were not completed at the time he and Norris killed Lamp. He also objects to the findings that the murders of Schaefer, Hall, Gilliam, and Ledford "involved the infliction of torture" (§ 190.2, subd. (a)(18)), raising the question whether the acts of torture must be the cause of death. (Compare *People* v. *Hoban* (1985) 176 Cal.App.3d 255, 264 [221 Cal.Rptr. 626] [torture-murder special circumstance does not require proof of causation]

and *People* v. *Talamantez* (1985) 169 Cal.App.3d 443, 455-456 [215 Cal.Rptr. 542] [torture murder under § 189 requires proof of causation].)

We find it unnecessary to resolve these issues. ██ A single valid special-circumstance finding is sufficient to determine that defendant is eligible for the death penalty. (See *People* v. *Velasquez* (1980) 26 Cal.3d 425, 436 [162 Cal.Rptr. 306, 606 P.2d 341].) Errors involving additional special circumstances, while they may prejudicially affect the penalty trial, do not undermine the verdict at the close of the guilt phase of the trial.

## VII.

### PENALTY PHASE ISSUES

1. *Excessive special circumstances.*

██ The jury found 38 special circumstances. Among them were 20 multiple-murder special circumstances. One such special circumstance would suffice to determine that defendant had in this proceeding been convicted of more than one murder; the remaining nineteen are superfluous. (*People* v. *Harris, supra,* 36 Cal.3d 36, 67.) We have also noted the possible invalidity of one witness-killing and four torture-murder special circumstances.

Despite finding 20 multiple-murder special circumstances, the jury was aware at all times that there were 5, not 20, murders. The questions concerning the validity of the witness-killing and torture-murder special circumstances are technical matters which do not affect the admissibility of evidence. Regardless of those circumstances the jury would still have heard evidence that defendant killed Lamp because she had witnessed the crimes he perpetrated on another victim, and that defendant had tortured four of his other victims. Finally, the jury found at least 14 valid special circumstances—far more than is found in most death penalty cases. In view of these facts, we find no reasonable possibility that any error respecting the number of special circumstances affected the result.

2. *The rebuttal testimony of Dr. Markman.*

In the penalty phase, defendant presented testimony from Dr. Maloney, a psychologist, who described defendant's history and personality, and concluded that he had an "antisocial personality disorder." He also called Dr. Tronkman, a psychiatrist, who testified that defendant may have committed the 1974 assault while in an altered state of consciousness. The prosecution then called another psychiatrist, Dr. Markman, in rebuttal. Dr. Markman

testified not only that defendant was not mentally ill at the time of the 1974 assault, but also that he was not mentally ill at the time of the murders charged in the present case.

 Defendant presents a variety of arguments attacking the admissibility of Dr. Markman's testimony, but all boil down to the claim that to the extent the testimony went beyond the 1974 offense it was not proper rebuttal.[30] Anticipating the obvious rejoinder that the defense, through Dr. Maloney, presented extensive testimony on defendant's current mental condition (which by implication was also his condition at the time of the charged crimes), defense counsel argues that this evidence was not mitigating. Perhaps so; one can argue that evidence that a defendant has been in jail most of his life and has an antisocial personality disorder is not likely to sway a jury in his favor. But the defense had nevertheless opened up the issue of defendant's mental condition; the prosecution should have the right to present rebuttal evidence on that topic.

3. *Instructions on evidence of uncharged crimes.*

 At the guilt phase of the trial the jury heard evidence of uncharged crimes, the assault upon and attempted kidnapping of Jan Malin. The prosecutor referred to this event in his penalty phase argument. The court, however, failed to instruct the jury at the penalty phase that before it could consider these crimes as aggravating factors, they must find beyond a reasonable doubt that defendant committed the crimes. In failing to so instruct, the court erred. (See *People* v. *Robertson* (1982) 33 Cal.3d 21, 55 [188 Cal.Rptr. 77, 655 P.2d 279].)

This error, however, is of little significance. Defendant admitted the assault on Malin. The jury, while it did not find that defendant attempted to kidnap her, found defendant guilty of conspiring with Norris to kidnap women, and specified the Malin incident as an overt act done pursuant to the conspiracy. Under these circumstances it is not reasonably possible that the failure of the court to give a reasonable-doubt instruction affected the verdict.

---

[30] He maintains that he did not receive proper notice of Dr. Markman's testimony, as would be required if the prosecution presented that testimony in its case-in-chief. He argues that the testimony was improper under Evidence Code section 730 because defendant did not put his mental state in issue. He argues that because defendant's mental state was not in issue, Dr. Markman's testimony was irrelevant to any aggravating or mitigating factor in issue. All of these arguments fail if Dr. Markman's testimony was proper rebuttal to the defense penalty evidence.

4. *Improper prosecution argument.*

Defendant attacks numerous assertions made during the prosecutor's penalty argument. Defense counsel did not object to any of these assertions at trial. We have never required an objection to raise claims of error based upon *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633] or *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440]. With respect to the other issues, since defendant failed to object, we must consider whether the harm could have been cured by a timely admonition. (*People* v. *Green, supra,* 27 Cal.3d 1, 28.)

(a) *Comment on defendant's failure to call Dr. Coburn.*

Dr. Maloney, testifying for the defense at the penalty trial, said he had discussed his report with Dr. Coburn, a psychiatrist, and that Dr. Coburn agreed with its conclusions. The defense did not call Dr. Coburn as a witness. In closing argument the prosecutor remarked, "And you didn't see Dr. Coburn testify here. Don't you believe that if there was some psychiatric evidence favorable to the defendant, that you would have seen it, when he's on trial for his life right now?"

 Defendant argues that since Dr. Coburn examined him at counsel's request, Dr. Coburn's opinions were protected by the attorney-client privilege. (*People* v. *Lines* (1975) 13 Cal.3d 500, 510 [119 Cal.Rptr. 225, 531 P.2d 793].) The prosecution may not comment upon a defendant's failure to call a witness if the defendant has a privilege to bar disclosure of that witness's testimony. (Evid. Code, § 913; see *People* v. *Wilkes* (1955) 44 Cal.2d 679, 687 [284 P.2d 481] [marital privilege]; *People* v. *Lathrom* (1961) 192 Cal.App.2d 216, 222 [13 Cal.Rptr. 325, 88 A.L.R.2d 785] [attorney-client privilege].)[31] But since any prejudice from the prosecutor's comment could have been cured by a timely objection and admonition, defense counsel's failure to object thus bars consideration of this issue.

(b) *Norris's nonviolent past.*

 The prosecutor argued without objection that "Bittaker was the one with the violent past" and that "Norris had been sent to prison on a rape by threat, not forcible rape, but a rape by threat." Since the evidence showed only Norris's conviction of rape, the prosecutor's assertion that the

---

[31] Our recent opinion in *People* v. *Ford* (1988) 45 Cal.3d 431 [247 Cal.Rptr. 121, 754 P.2d 168, A.L.R.4th 1507], concerned a different situation. In that case the witness had a privilege not to testify. The majority held that since the witness had not actually asserted that privilege, the prosecutor could comment on the defendant's failure to call the witness. Here it is the defendant who has a privilege not to call the witness.

rape was not forcible went beyond the evidence. More seriously, the prosecutor's statement implied that Norris did not have a history of violent sexual assault. Yet the prosecutor was aware that Norris had previously been found to have committed a violent rape in which he beat the victim with a rock, and was committed as a MDSO. The trial judge had excluded evidence of this event because of the difficulty in explaining MDSO classification and procedure to the jury. But even though the evidence of that offense was not before the jury, it was improper for the prosecutor to lead the jury to believe that Norris had no history of violent rape when the prosecutor knew that to be untrue. (Cf. *Miller v. Pate* (1967) 386 U.S. 1 [17 L.Ed.2d 690, 87 S.Ct. 785].)

If the only problem was the prosecutor's misstatement of the evidence—his assertion that Norris's 1976 conviction was for rape by threat, when the record was silent on the point—the matter could have been redressed by timely admonition. But the further implication that Norris had no history of violent rape probably could not have been cured without informing the jury that Norris had such a history. The trial court had previously refused to permit that information to go before the jury, and it is unlikely that an objection during closing argument would have changed that ruling.

We conclude that the misconduct in question is cognizable on appeal. We find, however, insufficient basis for reversal of the verdict. Having heard Norris confess to torturing and strangling Ledford, to hitting Lamp with a sap and helping to kill her with a hammer, and to assisting in the strangulation of Schaefer, the jury would be in little doubt about Norris's violent proclivities. We see no reasonable possibility that information about another violent rape—this one committed many years earlier—would have altered the verdict.

(c) *The death penalty as a deterrent.*

The prosecutor argued, without objection, that the jury should impose the death penalty to deter felons from murdering their victims. Our decisions in *People v. Love* (1961) 56 Cal.2d 720, 729-731 [16 Cal.Rptr. 777, 366 P.2d 33] and *People v. Ketchel, supra,* 59 Cal.2d 503, 536-540, condemn such argument. As explained in the latter case, "[t]he argument addresses the minds of the jury to the deterrence of designated 'potential killers' rather than the penalty to be adjudged to the defendants. . . . The sought imposition of the death penalty thus rests upon the unproven and illegitimate assumption that it acts as a deterrent to the described 'potential killers'. . . . The warning of the prosecution injected a false and foreign weight in the scale of the rendition of a delicate, crucial decision." (*People v.*

*Ketchel, supra,* 59 Cal.2d 503, 538-539.) The misconduct, however, could have been cured by timely objection and admonition.

(d) *Consistency to preclude reversal on appeal.*

 The prosecutor properly argued that the death penalty was appropriate for each of the murders. He then commented, without objection, that the jurors should make a consistent finding on all of the murders because "you have a chance of having your wishes carried out, as this case goes through the appellate court, more if you are consistent in your findings."

In *Caldwell* v. *Mississippi, supra,* 472 U.S. 320, the prosecutor argued to the jury that theirs was not the final decision as to life or death, but that the case would be reviewed by an appellate court. The United States Supreme Court reversed the penalty, holding that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." (Pp. 328-329 [86 L.Ed.2d at p. 239].)

Defendant characterizes the prosecutor's argument here as coming within the framework of *Caldwell* v. *Mississippi, supra,* 472 U.S. 320, but the frame does not fit. Arguably the mere mention of appeal is improper, since it rarely serves any constructive purpose and may lead the jury on its own to infer that their responsibility for penalty determination is diluted. But when the context does not suggest appellate correction of an erroneous death verdict, the danger that a jury will feel a lesser sense of responsibility for its verdict is minimal.

The prosecutor's comment, however, is clearly improper for another reason. It is not the function of the jury to "appeal proof" its verdict. It would obviously be improper for the jury to return a death verdict with respect to one murder to protect the death verdict it returned for a different murder, and the prosecutor should not have suggested that the jury do so. But although we thus conclude that the prosecutor's comment was improper, since it does not come within the scope of *Caldwell, supra,* 472 U.S. 320, defense counsel's failure to object is fatal to his contention.

(e) *The method of weighing factors and determining penalty.*

 The trial court instructed the penalty jury in the language of the 1978 death penalty law. In *People* v. *Brown, supra,* 40 Cal.3d 512, 538-544, we recognized that the wording of an instruction in the statutory language "leave[s] room for some confusion as to the jury's role" in determining the

appropriate penalty. (40 Cal.3d at p. 544, fn. 17.) We resolved to examine cases tried prior to *Brown,* such as the present case, "to determine whether, in context, the sentencer may have been misled to defendant's prejudice about the scope of its sentencing discretion under the 1978 law." (*Ibid.*) In this case, as in most, our inquiry begins by examining the prosecutor's penalty phase argument.

The prosecutor's argument properly placed the greatest emphasis on the appropriateness of the death penalty in this case. Shortly after beginning his argument, he asked the jury: "What penalty has Lawrence Sigmond Bittaker earned in this case? Has he earned the death penalty for the torture and suffering that he inflicted on Cindy Schaefer, Andrea Hall, Jackie Gilliam, Leah Lamp, and Lynette Ledford?" He continued: "Has he earned the death penalty for the barbaric and callous nature of his crimes which has shocked the public conscience and greatly affected all of us? . . . Or has he earned the lesser penalty of life imprisonment without the possibility of parole? And a chance to spread his tales of torture and violence and bloodshed to other adoring prisoners such as the Richard Shoopman type who will some day be paroled to prey on the young girls in our society? Does anyone actually believe that life imprisonment without possibility of parole is punishment for Mr. Bittaker? Where do you think he's been for 18 of the last 22 years? Prison, of course. It's his home."

After describing defendant's life in prison, the prosecutor continued: "Make no mistake about it, ladies and gentlemen, a sentence of life imprisonment without possibility of parole for Lawrence Bittaker in this case would be a total complete victory for him."

"When should the death penalty be imposed? . . . [S]ome cases are so brutal, so vicious, so horrendous, so inhumane that in order for us to exist as a society, we have to totally repudiate the conduct involved and we have to say, 'we will not accept it, we will not allow it, and the one mainly responsible for it has to suffer the supreme penalty.' . . . [¶] If the death penalty isn't proper in this case, when would it ever be proper?"

Finally, after reviewing the evidence in the case and discussing the statutory factors, the prosecutor concluded: "What has this monster earned? The death penalty? Or life imprisonment without possibility of parole? My only regret in this case, ladies and gentlemen, is that I can't ask you for more than the death penalty. Because even if Bittaker is executed in the gas chamber at San Quentin, that's quick and humane compared to what he did to these poor, tortured girls."

Other portions of the prosecutor's argument, however, do not correctly state the law. After reading a list of the 11 statutory factors under section

190.3, the prosecutor told the jury: "Now here's the real important paragraph. If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death.

"Now that takes some of the burden off of you. It's not a question of whether you like the death penalty or you don't like it or you're in favor of it or you're opposed to it. You're bound by law, you're bound as jurors to follow the law. . . .

"What this means is, say to give a simple example, if we were to give actual weight in pounds and ounces to the aggravating circumstances and the mitigating circumstances, if the aggravating circumstances weighed 10 pounds and one ounce and the mitigating circumstances weighed 10 pounds, then you would be duty bound to impose a death penalty.

"Now obviously I don't think in this case that it's even close. I mean the aggravating circumstances on a scale, they're going to put the scale way down at the bottom. And the mitigating circumstances aren't going to make that scale even come off the ground.

"If you were to give a percentage to it, if you said 50.1 percent of the evidence pointed to aggravating circumstances and 49.9 pointed to mitigating circumstances, then you'd still have to impose a sentence of death. But again I really don't think that it's going to be that close in this case. . . ."

This argument is inconsistent with our opinion in *People* v. *Allen* (1986) 42 Cal.3d 1222, 1276-1277 [232 Cal.Rptr. 849, 729 P.2d 115], because it depicts the weighing process as one involving the application of an arithmetical formula involving the assignment of weights to each of the factors, followed by an addition of the entries in each column to determine the balance. Any process which can yield a conclusion that aggravating considerations prevail by 50.1 percent to 49.9 percentage is clearly not the kind of qualitative moral assessment required by our decisions.

Furthermore, the prosecutor's claim that a death verdict is compelled if aggravating considerations outweigh mitigating by the slightest of margins—an ounce, or one-tenth of one percent—is directly contrary to *People* v. *Brown, supra,* 40 Cal.3d 512. *Brown* stated specifically that "to return a death judgment, the jury must be persuaded that the [aggravating factors are] so substantial in comparison with the [mitigating factors] that it warrants death instead of life without parole." (Pp. 541-542, fn. 13.) Upon rehearing, we approved a jury instruction to the same effect. (P. 545, fn. 19.) Under this language, it is clear that if a jury actually found a 50.1 to 49.9 percent balance in favor of aggravation, it could properly refuse to impose a

death verdict on the ground that the aggravating factors were not sufficiently substantial in comparison to the mitigating factors to warrant the death penalty.[32]

Other portions of the prosecutor's address implicate another concern we addressed in *Brown, supra,* 40 Cal.3d 512, and *Allen, supra,* 42 Cal.3d 1222. The prosecutor, as we have noted, told the jury that their task was not so much to determine what penalty defendant should receive—the law "takes some of [that] burden off of you"—as simply to determine whether aggravating factors outweigh mitigating. If they do "then you would be duty bound to impose a death verdict." This language suggests that the jurors do not have the ultimate burden of determining whether defendant should live or die. *Caldwell* v. *Mississippi, supra,* 472 U.S. 320, however, tells us that the sentencer must assume the full burden of deciding whether a defendant should live or die. A capital sentencing scheme relying on jury discretion, *Caldwell* said, assumes " 'that jurors confronted with the truly awesome responsibility of decreeing death for a fellow human will act with due regard for the consequences of their decision [ ].' . . . Belief in the truth of the assumption that sentencers treat the power to determine the appropriateness of death as an 'awesome responsibility' has allowed this Court to view sentencer discretion as consistent with . . . the Eighth [Amendment] . . . ." (Pp. 329-330 [86 L.Ed.2d at p. 240], quoting *McGautha* v. *California* (1971) 402 U.S. 183, 208 [28 L.Ed.2d 711, 726, 91 S.Ct. 1454].)[33]

Despite the prosecutor's erroneous arguments, upon review of the whole record, we find no danger that the jury was misled into undertaking a narrowly limited, mathematical analysis of the evidence and the statutory factors. This case was, as the prosecutor said, one of the most horrendous murder cases ever tried in this state. The evidence was graphic and compel-

---

[32] The prosecutor's description of the process by which the jury should decide the penalty verdict was inadequate because it left no place for a decision as to what penalty is appropriate. The prosecutor's language did not envision an appropriateness decision during the weighing process, for it describes the weighing as a separate decision which precedes the penalty determination, and one, moreover, based on a type of arithmetic calculation incompatible with a moral assessment. And it does not permit the jury to determine what penalty is appropriate after the weighing process because, according to the prosecutor, if aggravating circumstances outweigh mitigating the jurors have no choice but to impose the death penalty.

[33] The Attorney General points to *People v. Hendricks, supra,* 44 Cal.3d 635, 659, in which the prosecutor told the jury that the law "takes a little bit of sting out in the sense that you have to decide facts. Once you decide, if you do, that the aggravating circumstances outweigh the mitigating circumstances, it's automatic." (See also *People v. Guzman* (1988) 45 Cal.3d 915, 959-960 [248 Cal.Rptr. 467, 755 P.2d 917]; *People v. Boyde* (1988) 46 Cal.3d 212, 262-266 [250 Cal.Rptr. 83, 758 P.2d 25], cert. granted (1989) __ U.S. __ [104 L.Ed.2d 1002, 109 S.Ct. 2447].) But we did not endorse the prosecutor's arguments in *Hendricks, Guzman* or *Boyde.* Rather, we affirmed in each case because the majority concluded that the prosecutor's remarks did not have the effect of misleading the jury as to its responsibility to determine the appropriate penalty.

ling, showing not only defendant's commission of the crimes, but also defendant's careful and deliberate planning of the crimes, the astonishing cruelty with which they were committed, and his intent to continue to commit crimes of this character. Defendant not only demonstrates, but glories in his readiness to commit murder, rape, and torture. The prosecutor properly emphasized such facts to show that defendant deserved the death penalty. Under these circumstances, it is most unlikely that the jury would have been led by the prosecutor's explanation of the decisionmaking process to refrain from considering whether defendant's conduct warranted the death penalty, and induced instead to engage in a dispassionate analysis of the statutory factors to confirm that the aggravating predominate by at least 50.1 to 49.9 percent.[34] We find no reversible error.[35]

### 5. *Prejudice.*

The ordinary test of prejudice for penalty phase error is described in our recent opinion in *People* v. *Brown* (1988) 46 Cal.3d 432, 447 [250 Cal.Rptr. 604, 758 P.2d 1135]: the judgment will be affirmed unless we find a reasonable possibility that the jury would have rendered a different verdict had the errors not occurred. We have already examined the penalty phase errors, and concluded that each was not prejudicial. Applying the reasonable-possibility test of prejudice, we now conclude that the combined effect

---

[34] We do not rely on argument of defense counsel to sustain the penalty verdict. In view of the jury's guilt phase verdict finding 38 special circumstances—a verdict which necessarily rejected all the defense arguments—and its subsequent verdict imposing the death penalty for each of the murders, it seems apparent that defense argument was not very persuasive.

[35] Defendant also claims other portions of the prosecutor's argument were misconduct: 1. The prosecutor mentioned his participation in the Manson prosecution. (See *People* v. *Manson* (1977) 71 Cal.App.3d 1 [139 Cal.Rptr. 275].) This attempt by the prosecutor to enhance his stature with the jury is arguably improper, but hardly prejudicial.

2. In discussing the murder of Cindy Schaefer, the prosecutor said: "And then her body is thrown over so that the coyotes and the maggots and the beetles can finish her off so that nobody will find her. And nobody has found her. Not even a body for her parents to give a decent burial." Defendant claims this argument is improper under *People* v. *Boyd* (1985) 38 Cal.3d 762, 773-774 [215 Cal.Rptr. 1, 700 P.2d 782], as a reference to a nonstatutory aggravating factor. The manner in which the murderer disposes of the victim's body, however, is part of the circumstances of the crime, admissible under section 190.3, factor (a). The prosecutor's appeal, to be sure, was largely aimed at the emotions of the jury, but at the penalty phase, where the issue is whether defendant should be killed, considerable leeway is given for emotional appeal so long as it relates to relevant considerations. (See *People* v. *Haskett* (1982) 30 Cal.3d 841, 864 [180 Cal.Rptr. 640, 640 P.2d 776].)

3. The prosecutor said that defendant "would never be rehabilitated. He would just go out and do the same thing again." Defendant maintains that this statement improperly invited the jury to speculate on whether defendant might be released from prison despite a sentence of life imprisonment without possibility of parole. (See *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430].) In the absence of any reference to parole, pardon, commutation, or the like, we do not think the prosecutor's comment can be considered misconduct.

of the errors was not prejudicial. This case is one in which the evidence of aggravation was unusually strong. Defendant kidnapped and murdered five teenage girls, raped four of them, and tortured at least one. The photographs of the victims and the shocking tape recording of the torture of the last victim could not help but impress a jury. The evidence in mitigation, by contrast, was particularly weak; it established only that defendant was reasonably civil to persons who were not his victims, and that he had an antisocial personality disorder. On this record we can declare that there is no reasonable possibility that had the errors not occurred a different verdict would have been rendered.

The judgment is affirmed.

Lucas, C. J., Mosk, J., Panelli, J., Eagleson, J., Kaufman, J., and Arguelles, J.,* concurred.

Appellant's petition for a rehearing was denied August 24, 1989, and the opinion was modified to read as printed above.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.